**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
(212) 209-4800
David J. Molton
William R. Baldiga
Daniel J. Saval
May Orenstein
Tally M. Wiener

*Attorneys for the Petitioners*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | :    **Chapter 15** |
| | : |
| **FAIRFIELD SENTRY LIMITED, et al.,** | :    **Case No. 10-13164** |
| |    **Jointly Administered** |
|      **Debtors in Foreign Proceedings.** | : |
| | : |

## REPLY OF FOREIGN REPRESENTATIVES
## KENNETH KRYS AND CHRISTOPHER STRIDE
## TO DERIVATIVE PLAINTIFFS' OBJECTIONS TO
## PETITION FOR CHAPTER 15 RECOGNITION

Petitioners Kenneth Krys and Christopher Stride (the "Petitioners"), in their capacities as

the foreign representatives of the liquidations of Fairfield Sentry Limited ("Sentry") and Fairfield

Sigma Limited ("Sigma") pending before the Commercial Division of the High Court of Justice,

British Virgin Islands (the "BVI Court"), and Christopher Stride, in his capacity as the foreign

representative of the liquidation of Fairfield Lambda Limited ("Lambda" and, together with

Sentry and Sigma, the "Debtors") pending before the BVI Court, through their attorneys Brown

Rudnick LLP, respectfully submit this reply ("Reply") to the objection (the "Milberg Objection")

of Morning Mist Holdings Limited and Miguel Lomeli, plaintiffs in a putative derivative action

purportedly commenced on behalf of Sentry (the "Morning Mist Plaintiffs"), who are

represented by the law firms Milberg LLP and Seeger Weiss LLP, to the Chapter 15 petition filed by the Petitioners on behalf of Sentry [Docket No. 2] (the "Sentry Verified Petition").[1]  In support of the Reply, the Petitioners respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Milberg Objection, the *only* objection to the Sentry Verified Petition, should be viewed for what it is: an attempt by two law firms, indifferent to the actual interests of Sentry's estate and all of its stakeholders, to preserve their roles and investments in a legally defective derivative action.  In their irresponsible attempt to derail the proper administration of Sentry's assets in the U.S. by the Petitioners, indisputably the *sole* parties with authority to manage and administer Sentry's affairs and assets, these law firms ignore and seek to wish away the established legal principle that a debtor's center of main interests ("COMI") must be determined as of the time of the filing of the Chapter 15 petition.  Their objection is premised on the argument that the United States, and not the British Virgin Islands, is Sentry's COMI.  See Milberg Objection ¶ 17 n. 7.[2]  Since, as of the time of the filing of Sentry's Chapter 15 petition, Sentry has no place of business, no management and no tangible assets located in the United States, the Milberg Objection relies, as it must, on purely *historical* facts relating to Sentry's *former* ties to the United States, which have no bearing on the COMI determination.  Moreover, the Morning Mist Plaintiffs do not cite a single case wherein a court denied recognition of foreign proceedings based on a debtor's connections to a jurisdiction where the debtor has no place of business, maintains no tangible assets and has no management.

---

[1]   The Morning Mist Plaintiffs have not objected to the Chapter 15 petitions filed by the Petitioners on behalf of Sigma and Lambda (together with the Sentry Verified Petition, the "Verified Petitions.").

[2]   The Morning Mist Plaintiffs *do not dispute* that the BVI Proceedings are "foreign proceedings" within the meaning of 11 U.S.C. § 101(23) or that the Petitioners are "foreign representatives" within the meaning of 11 U.S.C. § 101(24).

2. The Milberg Objection does not come close to refuting the substantial evidence offered by Petitioners that, as of the filing date of the Petitions, the real seat of the Debtors is located in the BVI, and from that jurisdiction the Petitioners manage, direct, control and coordinate the affairs of Sentry. The Milberg Objection presents a highly distorted (and in some cases, misleading)[3] collection of isolated events and activities conducted outside of the BVI that, at most, reflect the undisputed fact that aspects of Sentry's liquidation are international in scope. But those activities – even in the aggregate – do not constitute evidence sufficient to rebut the presumption (or defeat the substantial evidence offered by Petitioners) that Sentry's COMI is in the BVI, let alone establish that i it is in the United States.

3. The underlying purpose of the COMI inquiry is to discern the debtor's "*real seat*" based on *objective facts* that are *ascertainable by third parties*, so that the COMI determination is consistent with the expectations and perceptions of stakeholders and other interested parties. In this regard, the cherry-picked trivia set forth in the Milberg Objection does not refute the fact that the Debtors' creditors, investors, contract counterparties and others have dealt exclusively with the Petitioners on matters pertaining to Sentry, or the objective, readily ascertainable facts that Sentry is being managed and administered within the BVI. Indeed, over a year ago, in late May and early June 2009, the Milberg firm and its co-counsel, on behalf of the Morning Mist Plaintiffs, themselves *ascertained* that Sentry was located in the BVI and therefore employed BVI residents to serve their putative derivative action and related New York State court special proceeding on Sentry *in the BVI*. See Declaration of Elizabeth Giler, dated July 16, 2010 ("Giler

---

[3] Among the recklessly false statements made by the Morning Mist Plaintiffs is that Brown Rudnick, the Petitioners' U.S. counsel, is handling the legal work in connection with the Debtors' BVI proceedings. See Milberg Objection ¶ 86. As explained in detail below, the BVI law firm Forbes Hare represent the Petitioners in the BVI proceedings, and that firm has performed substantial work in the 11 months since the Petitioners' appointment as Liquidators. See Declaration of William Hare in Further Support of the Debtors' Petitions, dated July 16, 2010, ¶¶ 8-13.

Declaration" or "<u>Giler Reply Dec.</u>"), and Exhibits A and C.

4.       If anything, the Milberg Objection underscores the Petitioners' need for Chapter 15 relief in the United States.  The Morning Mist Plaintiffs, who combined beneficially hold ⬚ ⬚ of Sentry's total shares, lack standing to prosecute derivative claims on Sentry's behalf because, *inter alia*: (i) they never, as was required of them under BVI law, petitioned the BVI Court for authority to prosecute the Morning Mist Action; (ii) the appointment of the Liquidators supervened any right of the Morning Mist Plaintiffs to seek such authority; and (iii) they are not registered shareholders of Sentry.  The Morning Mist Plaintiffs' remarkable claim that recognition should be denied because they, and not the Liquidators, are better equipped to prosecute those claims reflects their heedless indifference to the actual interests of Sentry's stakeholders.  Chapter 15 recognition will, *inter alia*, enable the Petitioners to take custody and control of the Debtors' assets for the benefit of all of their creditors (not just a few), and will prevent the Morning Mist Plaintiffs and their counsel from placing these valuable estate assets at risk by engaging in litigation without regard to the consequences thereof to Sentry's estate and all of its stakeholders.  The Milberg Objection should be overruled and the Sentry Verified Petition should be granted.

**ARGUMENT**

**THE PRESUMPTION THAT THE DEBTORS'
COMI IS IN THE BVI HAS NOT BEEN REBUTTED
AND AMPLE EVIDENCE ESTABLISHES COMI IN THE BVI**

I.      **Sentry's COMI Must Be Determined As Of The Date Of The Chapter 15 Filing.**

        5.      As discussed at length in the Petitioners' *Memorandum of Law In Support of Chapter 15 Petitions of Fairfield Sentry Limited, Fairfield Sigma Limited and Fairfield Lambda Limited for Recognition of Foreign Proceedings* [Docket No. 6] ("MOL") at pp. 16-18, the weight of the case law, relying on the plain language of the Bankruptcy Code, holds that a debtor's COMI must be determined as of the date of the Chapter 15 filing. The Morning Mist Plaintiffs urge this Court to disregard that rule and, instead, base the COMI determination on connections to a jurisdiction that are no longer extant. This position is directly at odds with the plain language of the Bankruptcy Code and dispositive case law and should be soundly rejected.

        6.      Indeed, the Fifth Circuit Court of Appeals (the only Circuit court that has addressed the issue) very recently held:

                Congress's choice to use the present tense [in Bankruptcy Code
                Section 1502(4)] requires courts to view the COMI determination
                in the present, i.e., at the time the petition for recognition was filed.
                If Congress had, in fact, intended bankruptcy courts to view the
                COMI determination through a lookback period or on a specific
                past date, it could have easily said so.

Lavie v. Ran (In re Ran), ___ F.3d ___, 2010 U.S. App. LEXIS 10882, *19 (5th Cir. May 27, 2010); see 11 U.S.C. § 1502(4) (defining foreign main proceeding as a "foreign proceeding pending in the country where the debtor *has* the center of its main interests") (emphasis supplied). While the Morning Mist Plaintiffs cite to the Ran decision at various points in their papers, they hide from and fail to acknowledge its central holding.

        7.      Moreover, as this Court knows, the Bear Stearns holding itself expressly reflects

that the operative facts to the COMI determination are those that exist in the present:

> As noted, each of the Funds' real seat and therefore their COMI is the United States, the place where the Funds *conduct* the administration of their interests on a regular basis and is therefore ascertainable by third parties, … and more specifically is located in this district where principal interests, assets and management *are* located.

Bear Stearns, 374 B.R. at 130 (emphasis supplied).

8.      Desperately trying to undercut the significance of the presence, prior to the filing of the Petitions (as well as the fact that there were, to the Liquidators' knowledge, no tangible assets in the United States at the time of filing), of substantial tangible assets (liquid cash) in the BVI, the Morning Mist Plaintiffs put misplaced reliance on this Court's decision in Bear Stearns. They point to the fact that the Bankruptcy Court considered the presence, prior to the commencement of foreign liquidation proceedings, of all of the debtors' liquid assets in the United States as relevant to its COMI determination, but found insignificant for COMI purposes the fact that, following the commencement of those proceedings, funds were transferred to the Cayman Islands (the COMI alleged by the petitioners in that case) following the commencement of those proceedings. See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 130 & n.10 (Bankr. S.D.N.Y. 2007), aff'd 389 B.R. 325 (S.D.N.Y. 2008). However, as this Court is aware, the COMI significance of the date on which the funds transfer occurred in Bear Stearns was due *to its relation to the date on which the the Chapter 15 petitions were filed by the debtors* – in that case, the money was transferred from the United States *after* the filing of the Chapter 15 petition (which was filed on the same day as the commencement of the foreign proceedings). In affirming this Court's decision on appeal, the District Court explained the significance of the timeline of events in Bear Stearns. "Appellants argue that most of the Funds' remaining liquid assets are in bank accounts in the Cayman

Islands. However, *prior to filing the Chapter 15 Petition*, all of the Funds' funds were maintained in [their] accounts with [their] prime broker in the United States. … *Post-[chapter 15] filing*, some millions of dollars in cash were directed to accounts in the Cayman Islands instead of their usual destination in the United States. … *[A]t the time of the [chapter 15] petition there were no assets of the Funds in the Cayman Islands*." <u>In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.</u>, 389 B.R. 325, 338-39 (S.D.N.Y. 2008) (emphasis supplied).

9.     Consistent with its disregard for present realities, the Milberg Objection is strewn with references to historical facts, no longer reflecting a connection between the Debtors and New York, that should be disregarded by the Court in determining whether the statutory presumption (that Sentry's COMI is in the BVI) has been rebutted, such as the following:

- "Madoff himself played an important role with respect to Sentry." ¶ 2.

- "Of the three directors, one – Walter Noel, Jr., the founder and principal of Fairfield Greenwich Group – maintained a residence in New York…." ¶ 6.

- "Sentry – on each occasion that it transferred cash to BLMIS – transferred that cash to New York." ¶ 8.

- "[I]n his declaration and at his deposition, Krys described FGG as Sentry's investment manager….As Krys testified, FGG was based in Manhattan's Upper East Side." ¶ 47.

10.     The Fifth Circuit in <u>Ran</u> explicitly rejected the approach, relied on by the Morning Mist Plaintiffs, that considers a debtor's operational history:

> [E]xamining a debtor's COMI at the time the petition for recognition is filed fulfills Congress's purpose for implementing Chapter 15. As noted above, Chapter 15 was implemented by Congress in an attempt to harmonize transnational insolvency proceedings. If we were to assess COMI by focusing on [the debtor's] operational history, there would be an increased likelihood of conflicting COMI determinations, as courts may tend to attach greater importance to activities in their own countries, or

7

> may simply weigh the evidence differently which may lead to the possibility of competing main proceedings, thus defeating the purpose of using the COMI construct.....In fact, *a meandering and never-ending inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because he conducted past activities in a country at some point well before the petition for recognition was sought.*

Ran, 2010 U.S. App. LEXIS at *19-20 (emphasis supplied and internal citation omitted). As determined in Ran, a COMI inquiry focused on a defunct operational history is not only inconsistent with the plain language of the Bankruptcy Code, but also the purposes of Chapter 15, general cross-border insolvency principles and logic.

11. The Morning Mist Plaintiffs seek to downplay the significance of Ran in a footnote, citing *dictum* in which the Court opined that a "recent" change by the debtor of its domicile may affect the weight given to it in a COMI determination. See Milberg Objection ¶ 23 n.9. However, the instant record does not reflect an opportunistic shift in the Debtors' COMI-significant connections to the BVI. Nor does the record reflect that a shift was made as part of a scheme to manufacture COMI.[4] Rather, the process by which Sentry's BVI connections manifested and solidified was organic, incremental and evident and ascertainable to third parties,

---

[4] On this point, it has been noted:

> But forum shopping should be of less concern when the debtor moves its COMI *to* the place of its registered offices (as opposed to *away from* it) as a consequence of a statutorily mandated insolvency scheme promulgated by the same sovereign under which the debtor was organized. To be sure, Congress presumes COMI to be there, and most creditors know (or can reasonably be deemed to know) the location of their debtor's registered offices. It is hard to imagine, therefore, that they would not reasonably expect to be subject to insolvency procedures there. Indeed, the registration decision occurs long before insolvency and it unlikely that it is made in contemplation of insolvency. Unless debtors move their place of registration on the eve of bankruptcy (perhaps a good example of forum shopping), the world is placed on notice that dissolution may one day occur there.

Mark Lightner, Determining the Center of Main Interests Under Chapter 15, 18 Norton J. Bankr. L. & Prac. 5, Art. 2 p. 6 (October 2009) (emphasis in original).

and pre-dated the Petitioners' appointment by over 7 months. That process began in December 2008 (some 19 months ago), following the revelations that BLMIS was operated as a Ponzi scheme. In the following weeks, Sentry began to sever ties with New York and its New York-based managers (Fairfield Greenwich Group ("FGG")): its FGG director only participated in 2 board meetings following December 18, 2008; a Litigation Committee -- comprised of independent and non-New York, non-United States based directors -- was formed in February 2009 to govern Sentry's affairs; only one board meeting was held in New York (which occurred days after the Madoff fraud disclosure, with the remainder primarily conducted telephonically through calls originated by Sentry's BVI counsel);[5] and Sentry formally terminated its investment management agreement with FGG on May 29, 2009, effective June 30, 2009. Then, once the Petitioners were appointed as Liquidators for Sentry in July 2009, they commenced efforts to investigate, identify, collect and take control over Sentry's assets (including its books, records and cash) and bring those assets to the BVI. See Declaration of Kenneth Krys in Further Support of Debtors' Petitions, dated July 16, 2010 ("Krys Reply Declaration" or "Krys Reply Dec.") at ¶ 15. Indeed, a recent decision explained a scenario very similar to the instant one:

> There may be instances where a foreign representative remains in place for an extended period, and relocates all of the primary business activities of the debtor to his location (or brings business to a halt), thereby causing creditors and other parties to look to the judicial manager as the location of a debtor's business. This could lead to the conclusion that the center of its main interest has

---

[5] The Morning Mist Plaintiffs have challenged those portions of the *Declaration of Kenneth Krys*, dated June 14, 2010 [Docket No. 3] ("Krys Initial Declaration" or "Krys Initial Dec.") that discuss the location of Sentry's board meetings prior to the Liquidators' appointment, on the basis that Mr. Krys does not have personal knowledge of those meetings (even though the Liquidators control the books and records of Debtors and now constitute the management thereof). See Milberg Objection ¶ 17 n.7. The Petitioners have contemporaneously filed with this Reply the *Declaration of Gareth Thomas* dated July 16, 2010 ("Thomas Declaration" or "Thomas Dec."). Mr. Thomas, the former General Manager of Codan Trust (BVI) Limited, Sentry's registered agent, personally attended 31 meetings of Sentry's Board of Directors or Litigation Committee. See Thomas Dec. ¶ 9.

become lodged with the foreign representative.

In re British American Ins. Co. Ltd., 425 B.R. 884, 914 (Bankr. S.D. Fla. 2010).[6]

## II.  A BVI COMI Comports With The Reasonable Expectations Of Third Parties.

12.    It bears emphasizing that the overriding purpose of the COMI determination is to discern the real seat of the debtor as "ascertainable, and perceived, by third parties."    See In re Betcorp Ltd., 400 B.R. 266, 290 (Bankr. D. Nev. 2009).    In other words, the COMI determination should comport with the reasonable expectation of third parties, including creditors and other stakeholders.  As explained by the Fifth Circuit in the Ran decision:  "The presumption is that *creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating* to resolve any difficulties they have with that debtor, regardless of whether such resolution is informal, administrative or judicial."  2010 U.S. App. LEXIS 10882, *20-21 (emphasis supplied).

13.    In this case, as explained in the Krys Initial Declaration, the Krys Reply Declaration and the MOL, the objective facts, as ascertainable by third parties, demonstrate that the administration of Sentry's only ongoing business activities (i.e., its liquidation) is centered in the BVI (and certainly not in the United States).  The Debtors' present and former contract counterparties (including administrative agents, payment agents and depositories), the BLMIS Trustee and all parties to litigation involving the Debtors deal exclusively with the Liquidators as the representatives of the Debtors.  See Krys Initial Dec. ¶¶ 6-7.  On each occasion the

---

[6]    The Morning Mist Plaintiffs assert that liquidation activities conducted in a jurisdiction "by themselves, do not establish COMI in that jurisdiction (otherwise, the COMI inquiry itself would be essentially meaningless)."  Milberg Objection ¶ 53.  The Morning Mist Plaintiffs do not cite any authority for this proposition, nor can they, because it is not the law.  Here, Sentry's business *is its* liquidation and the identification, realization, collection, monetization and/or administration of its assets.  If the Morning Mist Plaintiffs' proposition were true, no liquidating debtor would have a COMI and, as a result, would be categorically denied foreign main recognition (and related relief) under Chapter 15.

Liquidators have corresponded with Sentry's investors (which correspondence dates back to *July 2009*), they have done so on the letterhead of Krys & Associates' BVI offices. <u>See</u> Krys Reply Dec. ¶ 24. Significantly, the *first* listing on a "Google" or "Yahoo" search for "Fairfield Sentry" is the Liquidators' website for Sentry (www.fairfieldsentry.com), which has been maintained since August 2009 and which also identifies the Liquidators' address as the BVI offices of Krys & Associates. <u>See</u> <u>id.</u> ¶ 25.

14.     But this Court does not need to rely solely on the actions of the Petitioners and Sentry's prior management to determine that third parties reasonably believe Sentry's COMI to be in the BVI. Neither Sentry's former management nor the Petitioners were responsible for the commencement of BVI proceedings for the liquidation of Sentry. Rather, ten Sentry investors -- from jurisdictions all over the world -- determined that the BVI (and not New York) was the appropriate forum for its liquidation, as demonstrated by their commencement of proceedings in April 2009 before the BVI Court for the appointment of a liquidator. <u>See</u> Declaration of Sashi Bach Boruchow, dated July 16, 2010 ("<u>Boruchow Dec.</u>") at ¶ 3. Indeed, had the petitioning investors reasonably perceived Sentry's COMI to be in New York, they could have sought to file an involuntary bankruptcy proceeding against Sentry in this Court. <u>See</u> 28 U.S.C. § 1408(1) (venue for a bankruptcy case proper in the district "in which the domicile, residence, *principal place of business* in the United States, or principal assets in the United States" of the debtor have been located for 180 days immediately preceding the commencement of the case or for a longer portion of such 180 day period than any other district) (emphasis supplied).

15.     Following the Petitioners' appointment as Liquidators, counsel to nine of the petitioning investors, which is also acting as co-lead counsel in a putative class action on behalf of Sentry investors, has "dealt principally with Ken Krys, Chris Stride, Joanna Lau, and

Charlotte Caulfield [all of whom work in Krys & Associates' BVI offices] on issues related to [Sentry's] current and ongoing business, management and affairs."  Boruchow Dec. ¶ 7.  A recent decision has recognized that the COMI determination can be based on the activities of a liquidator that are well-known to creditors and other parties.  See In re British American Ins. Co. Ltd., 425 B.R. at 914 ("There may be instances where a foreign representative remains in place for an extended period…*thereby causing creditors and other parties to look to the judicial manager as the location of a debtor's business.*  This could lead to the conclusion that the center of its main interest has become lodged with the foreign representative.") (emphasis supplied).

16.      The Morning Mist Plaintiffs erroneous contention that third party perceptions support a COMI in the United States because certain third parties "perceiv*ed*" the U.S. as Sentry's COMI is improperly reliant on past perceptions rather than current realities.  See Milberg Objection ¶ 45 (emphasis supplied).  The law recognizes that the COMI determination should comport with the location where third parties currently "perceive" the debtor to be presently centered, not where they may have "perceiv*ed*" the debtor to be located in the past. See Ran, 2010 U.S. App. LEXIS 10882, * 20 ("*If the debtor's main interests are in a particular country and third parties observe this situation, it should be irrelevant that the debtor's interests were previously centered in a different country* almost a decade prior to the receiver attempting to have the foreign bankruptcy proceeding recognized.") (emphasis supplied).  Accordingly, and as discussed above, the Morning Mist Plaintiffs' reliance on supervened historical circumstances and outdated facts regarding Sentry's former ties to New York, including those set forth in the 2006 Private Placement Memorandum of Fairfield Sentry Limited ("PPM"), is entirely misplaced and without legal merit.  See Milberg Objection ¶¶ 46-52 (setting forth certain representations in the PPM).  Indeed, the revelation in December 2008 that Bernard Madoff had

operated BLMIS as a massive Ponzi scheme was widely reported by news outfits across the world. Accordingly, the public at large familiar with Sentry and its business (i.e., its creditors and investors) reasonably understood in December 2008 that Sentry's investment activities in BLMIS (i.e., investments in New York) had ceased.

17. Of course, the Morning Mist Plaintiffs' own actions, and that of their counsel, demonstrate that following Madoff's fall they understood and viewed Sentry's COMI to be in the BVI. In May 2009, over a year prior to the filing of Sentry's Chapter 15 petition, the Morning Mist Plaintiffs' counsel employed *BVI residents* to serve their summons, complaint and petition for leave to file a derivative action on Sentry *in the BVI*, pursuant to the Hague Convention See Krys Reply Dec., Exhibit N (Affidavits of Service on Fairfield Sentry Limited); Giler Reply Dec., Exhibit A. Notably, had the Morning Mist Plaintiffs in fact viewed Sentry's COMI or "principal place of business" to be in the United States at that point in time, they could have, pursuant to the New York CPLR, simply served their papers on Sentry in New York.[7] The record thus firmly demonstrates that, as of the filing date of the Sentry Verified Petition, the reasonable expectation of third parties, *including the Morning Mist Plaintiffs*, was that Sentry's COMI is in the BVI.

## III. A BVI COMI Is Supported By Recent U.S. Supreme Court Authority.

18. It is well recognized that an entity's COMI for purposes of Chapter 15 is the practical equivalent of its principal place of business. See <u>Bear Stearns</u>, 374 B.R. at 129 (COMI "generally equates with the concept of a 'principal place of business' in United States law")

---

[7] CPLR 311(a) authorizes service on corporations pursuant to Sections 306 and 307 of the New York Business Corporation Law ("<u>NY BCL</u>"). In turn, NY BCL 307(a) provides that service can be effected on an unauthorized foreign corporation (one, like Sentry, that has not registered to do business in the state) by serving the New York Secretary of State, if there is jurisdiction over that corporation pursuant to Article 3 of the CPLR (e.g., the corporation's place of business is in the state). If the Morning Mist Plaintiffs believed that Sentry was in New York, they could have chosen to serve Sentry in this manner. They did not do so; instead they sought to find and serve Sentry in the BVI.

(citing In re Tri-Continental Exchange, 349 B.R. 627, 633-34 (Bankr. E.D. Cal. 2006));  see also

In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008) (noting that the

EU regulation adopting the European Union Convention on Insolvency Proceedings refers to

COMI as the general equivalent of the concept of principal place of business under United States

law); In re British American Ins. Co. Ltd., 425 B.R. 884, 908 (Bankr. S.D. Fla. 2010) ("Several

courts have likened COMI to the 'principal place of business' concept under United States

law."); In re Betcorp Ltd., 400 B.R. at 287 (COMI is "virtually identical to the more commonly

used (at least in the United States) concept of 'principal place of business'"); In re Tradex Swiss

AG, 384 B.R. 34, 42 (Bankr. D. Mass. 2008) (same); In re Ernst & Young, Inc., 383 B.R. 773,

777 (Bankr. D. Colo. 2008) (same).  The Morning Mist Plaintiffs acknowledge this.  See Milberg

Objection ¶ 15 ("COMI has been equated to the concept of a 'principle [sic] place of

business.'").

19.     In February of this year, the U.S. Supreme Court, in the case Hertz Corp. v. Fried,

130 S. Ct. 1181 (2010), held that a corporation's "principal place of business" is the "place

where a corporation's officers direct, control, and coordinate the corporation's activities" – *i.e.*,

the corporation's "nerve center."  Id. at 1192.  Notably, the Supreme Court in Hertz resolved a

Circuit Court split on the issue and rejected adoption of the competing "business activities" test,

which focuses on where a corporation's actual business activities are located.  Id. at 1191.  In its

decision, the Court, recognizing the importance of third party expectations (the public's

consideration), ruled:

>           A corporation's "nerve center," usually its main headquarters, is a
> single place.  The public often (though not always) considers it the
> corporation's main place of business.  And it is a place within a
> State.  By contrast, the application of a more general business
> activities test has led some courts, as in the present case, to look,
> not at a particular place within a State, but incorrectly at the State

itself, measuring the total amount of business activities that the corporation conducts there and determining whether they are "significantly larger" than in the next-ranking State.

Id. at 1193. The Court also noted that applying the "nerve center" test promotes "administrative simplicity." Id. As the Court stated: "The metaphor of a corporation 'brain,' while not precise, suggests a single location. By contrast, a corporation's general business activities more often lack a single principal place where they take place." Id. at 1193-94.

20. The Liquidators submit that the Hertz case is highly instructive to the COMI determination in this instance. The Liquidators function as Sentry's officers, having been vested with exclusive management powers over Sentry by orders of the BVI Court and pursuant to BVI law. Here, the record plainly reflects that the Liquidators direct, control, and coordinate Sentry's affairs from the BVI, under the auspices and close oversight of the BVI Court. Below is a list of the management-level employees of Krys & Associates that are resident in their BVI offices, their titles and their responsibilities in connection with the Debtors' liquidation proceedings:

- Kenneth Krys (Petitioner/Liquidator): Mr. Krys is the founder and Chief Executive Officer of Krys & Associates (BVI) Ltd. and is licensed by the BVI Financial Services Commission as an insolvency practitioner. Although Mr. Krys travels frequently in connection with his work as a Liquidator and on other matters, he currently spends more days per month in the BVI than in any other country. See Transcript of Deposition of Kenneth Krys, dated June 30, 2010 ("Krys Dep. Tr.") at 6.[8]

- Christopher Stride (Petitioner/Liquidator): Mr. Stride is a Managing Director of Krys & Associates' BVI and is licensed by the BVI Financial Services Commission as an insolvency practitioner.

- Joanna Lau: Ms. Lau is a Managing Director of Krys & Associates' BVI office and is licensed by the BVI Financial Services Commission as an insolvency practitioner.

- Charlotte Caulfield: Ms. Caulfield is a Manager of Krys & Associates' BVI

---

[8] The Krys Dep. Tr. is attached as Exhibit 1 to the Declaration of Kent A. Bronson, dated July 8, 2010, submitted with the Milberg Objection.

office and is licensed by the BVI Financial Services Commission as an insolvency practitioner.

See Krys Reply Dec. ¶ 18.

21.     Moreover, the Liquidators have engaged legal counsel in several jurisdictions to perform various activities in aid of the Debtors' liquidations:

- counsel in the BVI (Forbes Hare) was retained in July 2009 and proceeded to handle all legal work relating to and implicating the BVI liquidation proceedings and to provide advice on all issues of BVI law and international legal strategy;

- counsel in Ireland (Gallen Alliance) was retained in June 2010 and proceeded to commence recognition proceedings in that jurisdiction for purpose of taking control of over $70 million in funds in a Sentry bank account in Dublin that is subject to an attachment;

- counsel in the United Kingdom (Stephen Moverley Smith QC) was retained in July 2009 and proceeded to provide general advice regarding litigation, case strategy, and British insolvency law;

- counsel in the Netherlands (Brada Kuttner) was retained in September 2009 and proceeded to investigate possible claims against various entities in the Netherlands and to provide advice on Dutch law and any proceedings brought in that jurisdiction;

- counsel in Canada (Stikeman Elliot) was consulted in March 2010 and proceeded to investigate possible claims against various entities in Canada and to provide advice on Canadian law and any proceedings brought in that jurisdiction;

- counsel in the United States (Brown Rudnick) was retained in August 2009 and proceeded to handle matters relating to the BLMIS Adversary Proceeding, pursue certain litigation and commence these Chapter 15 proceedings.

See Krys Reply Dec. ¶ 11.  *All of the legal work being performed in the BVI and abroad is managed and directed by the Petitioners and other management-level employees that work out of Krys & Associates' BVI offices*.  See id. ¶ 21.  In other words, a legion of evidence in the record strongly reflects that the Debtors' "nerve center" is located in the BVI and nowhere else.

22.     Hertz specifically rejects the method of assessing the relevant significance of

different "business activities" as the means for ascertaining a corporation's principal place of business (which, in any event, would not point to a U.S. COMI), in favor of identifying the *single* jurisdiction in which those activities are directed, managed, administrated and controlled – which in this case is the BVI. That approach is entirely consistent with cases under Chapter 15 that, in seeking to determine the sole COMI, look to the location of the debtor's true management as a significant, if not dominant, factor in the COMI determination. See, e.g., British American Insurance Co. Ltd., 425 B.R. at 910-11 (COMI determined to be where a wholly-owned subsidiary managed the debtor's affairs); Bear Stearns, 374 B.R. at 128 (emphasizing that the relevance of the location of debtor's management in the COMI determination, "*which conceivably could be the headquarters of a holding company*" (i.e., a jurisdiction in which the debtor may not conduct *any* non-management business activities) (emphasis supplied)). Moreover, as the Supreme Court recognized, the public most often views a company's "nerve center" to be its principal place of business, and therefore determining COMI with due regard to a company's "nerve center" is consistent with third party expectations.

## IV. There Is Nothing Inappropriate About the Petitioners Filing The Chapter 15 Petition 11 Months After Their Appointment As Liquidators.

23. Perhaps frustrated that neither the law nor the facts support their position, the Morning Mist Plaintiffs accuse the Petitioners of "manipulating" COMI by not filing their Chapter 15 petitions until 11 months following their appointment as Liquidators. See Milberg Objection ¶ 24. The Morning Mist Plaintiffs' assertion that the Petitioners have simply "waited around" to file their Chapter 15 petitions is absolutely baseless and ignores the Petitioners' informed and deliberate approach (closely supervised and approved by the BVI Court) to providing a basis for recovery to the Debtors' stakeholders, all of whom are victims of the Madoff fraud.

24.     The Petitioners' course of action, including the timing of the filing of the Chapter 15 petitions, was entirely appropriate under the circumstances (and closely supervised by the BVI Court).  At the time of the Liquidators' appointment, the Debtors' affairs were in disarray.  See Krys Reply Dec. ¶ 15.  Based on the unique situation of the Debtors, the Liquidators prioritized certain activities to facilitate an orderly and value accretive liquidation.  See id.  Those activities included, among others: (i) retrieving, compiling and/or reconstructing the Debtors' books and records; (ii) analyzing the Debtors' potential claims and causes of action, (iii) entering into tolling and related arrangements with potential defendants; (iv) retaining appropriate professionals; (v) preserving claims through filing certain actions in the BVI and New York; and (vi) identifying and quantifying certain liquid and illiquid fund assets in the control of third parties.  See id.  Moreover, the Petitioners were required to obtain the express approval of the BVI Court prior to filing their Chapter 15 petitions (as well as in connection with their other important activities).  See id. ¶ 17.

25.     In short, there is nothing untoward about the fact that the Petitioners' activities and the BVI proceedings have progressed prior to the Petitioners' commencing their U.S. ancillary proceedings.  There is certainly no provision of the Bankruptcy Code that requires a foreign representative to commence a Chapter 15 case contemporaneous with the foreign proceeding.  Indeed, it is precisely those situations where a foreign representative races to a U.S. bankruptcy court immediately after appointment (in certain cases to disrupt a competing distribution scheme) where recognition has been denied.  See Bear Stearns, 374 B.R.122 (recognition denied where debtors filed Chapter 15 petitions on the same date as the commencement of their foreign proceedings); In re SPhinX, Ltd., 351 B.R. 103, 121 (Bankr. S.D.N.Y. 2006) (foreign main recognition denied where liquidators filed Chapter 15 petitions

days after their official appointment).

## V. That Certain Contingent Litigation Claims Are Venued In The U.S. Does Not Defeat BVI COMI.

26.     The Milberg Objection asserts that the Debtors' COMI is the United States because certain of Sentry's claims and causes of action are pending in New York.  The Petitioners do not contest that Sentry's contingent claims and causes of action comprise principal assets of its estate (however, none of Debtors' significant tangible assets (cash) have been or are in the United States; on the date the Petitions were filed, the Debtors' cash was located in Ireland, England and the BVI).  However, that certain of those claims and causes of actions are venued in New York does not demonstrate that Sentry's COMI is in the United States.  Indeed, the Morning Mist Plaintiffs *do not cite a single case* supporting the proposition that the venue of contingent litigation claims is probative, let alone dispositive, on the COMI determination.

27.     First, the Morning Mist Plaintiffs argue that Sentry's filing of a $6.2 billion claim against the BLMIS estate in this Court (the sum is based on Sentry's last "fictitious" statement from Madoff; the Petitioners believe that Sentry's "net loss" was over $1 billion) points to a U.S. COMI.  See Milberg Objection ¶ 27.  However, the filing of that claim – which is contingent, unliquidated and presently disputed by the BLMIS Trustee (who seeks disallowance thereof) and which was filed in early 2009 prior to the Petitioners' appointment as Sentry's Liquidators – does no more than establish that, *at times prior to the collapse of BLMIS*, Sentry invested funds with BLMIS.  Under the logic of the Morning Mist Plaintiffs' argument, the venue of litigation arising from prior operations would determine COMI, even if, following the events giving rise to such litigation, the plaintiff thereafter removed all of its operations, management and/or administration to another jurisdiction.  As explained above, that is certainly not the law.  For the same reason, the New York venue of (i) Sentry's lawsuit against FGG and related persons, and

19

(ii) the BLMIS Trustee's action against Sentry, is also not determinative or even relevant to the COMI determination.

28.     The Morning Mist Plaintiffs also emphasize that the Liquidators have filed certain actions in New York to recover redemption payments to Sentry investors (the "U.S. Redeemer Actions").[9]  While those actions have been brought pursuant to New York consent-to jurisdiction provisions in Sentry's subscription agreements, those actions lie against individuals and entities scattered across many international jurisdictions, a point acknowledged by the Morning Mist Plaintiffs.   See Milberg Objection ¶ 29 (noting that the U.S. Redeemer Actions "names as defendants persons located in New York City, Delaware and Florida, as well as the Bahamas, Bermuda, the Cayman Islands, Panama, Switzerland, Ecuador and Hong Kong").  In fact, of the 70 U.S. Redeemer Actions the Liquidators have commenced as of the date of the filing of the Petitions,  60 -- or 85.7% -- of those name defendants that are not based in the United States. See Petitioners' Rule 1007 Statement, attached as Exhibit 4 to the Sentry Verified Petition.  As explained in the Krys Initial Declaration, Petitioners have commenced these actions in New York for reasons including consent-to-jurisdiction and simplified service provisions in the relevant subscription agreements, giving New York courts jurisdiction over foreign entities who might otherwise be difficult and expensive for the Petitioners to pursue.  See Krys Initial Dec. ¶ 39(c). However, the assets to satisfy any judgments obtained in those actions will likely need to be pursued in jurisdictions *outside* of the United States.[10]

---

[9]     This position is at odds with and puts the lie to the Milberg Objection's "COMI manipulation" argument.  Had Petitioners filed their Chapter 15 petitions prior to April 2010 (when the New York State court actions were first commenced in accordance with the approval order of the BVI Court), these New York State court actions would not be, as they are now, used by the Milberg Objection to claim a United States COMI.

[10]    The Morning Mist Plaintiffs also argue that a purported New York COMI is bolstered by the fact that the Morning Mist Action is pending in New York.  Given that the Morning Mist Action was

29.     The Morning Mist Plaintiffs' argument with respect to the venue of litigation is also ignores substantial litigation activities in jurisdictions other than the United States.   In December 2008, Stichting Shell Pensioenfonds ("Shell"), a Sentry investor, commenced an action against Sentry in the District Court of Amsterdam, The Netherlands (the "Amsterdam Court"), and obtained a pre-judgment attachment (the "Shell Attachment") of up to a maximum of $80 million of Sentry's funds held in a bank account (the "Sentry Account") Sentry maintained with the Dublin branch of Citco Bank Nederland, NV ("CBN").   See Declaration of William Hare in Further Support of the Debtors' Petitions, dated July 16, 2010 ("Hare Reply Declaration" or "Hare Reply Dec."), ¶ 13.   Also, in April 2009, Atlanta Business Inc., another Sentry investor, obtained a pre-judgment attachment from the Amsterdam Court of Sentry's funds held in the Sentry Account of up to a maximum of $6.9 million (the "Atlanta Attachment").   See id.   Shell has proceeded to initiate substantive proceedings in the Amsterdam Court against Sentry in an effort to obtain the attached funds, the first of which was held on July 7, 2010.   See id.   The proceedings were formally served on Sentry on July 14, 2010 under the Hague Convention on Service of Judicial Documents at Sentry's registered office in the BVI.   See id.   The Liquidators must file a defense by September 1, 2010, which they will coordinate with Dutch counsel, Brada Kuttner.   See id.

30.     In addition to the litigation activities occurring in The Netherlands, on July 12, 2010, the Petitioners submitted an application to the High Court in Ireland (the "Ireland Court") for an order recognizing the Sentry BVI Proceeding in the Ireland Court for the purpose of obtaining declaratory relief, for the benefit of the stakeholders of Sentry, that Sentry is entitled to the $73 million balance on the Sentry Account maintained at the Dublin branch of CBN that is

---

improperly commenced and that the Morning Mist Plaintiffs lack standing to assert claims on behalf of Sentry (see infra, ¶¶ 63-69), the present venue of the Morning Mist Action should be disregarded by the Court.

subject to the Shell and Atlanta Attachments. *See* Krys Reply Dec. ¶ 29; *see* also *Amended 11 U.S.C. § 1515(c) Statement Of Foreign Representatives Kenneth Krys And Christopher Stride* [Docket No. 30]**.**

31.    Apart from the litigation activities occurring in Ireland and The Netherlands, beginning in the fall of 2009, the Petitioners commenced 6 sets of proceedings in the BVI against a total of 160 defendants seeking the recovery of redemptions paid out of Sentry during the months October 2003 through March 2004. *See* Hare Reply Dec. ¶ 13. Those proceedings have been issued and are in the process of being served under the Hague Convention pursuant to orders of the BVI Court. Id.

32.    Thus, the record reflects that litigation activities on behalf of Sentry are being pursued across several jurisdictions internationally, including in the BVI, to collect assets located all over the world, and are not centered in the United States. Moreover, all such litigation activities are being directed, managed and controlled by the Liquidators in the BVI, under the auspices and close supervision of the BVI Court. See Hare Reply Dec. ¶ 9. In fact, the Liquidators must obtain the permission of the BVI Court to bring, defend, discontinue or compromise any legal proceedings in the BVI or in any other jurisdiction (including the United States). Id. Moreover, any proceedings brought by or against the Liquidators or the Debtors in any jurisdiction must be conducted in accordance with directions given from time to time by the BVI Court. See id. Accordingly, and as discussed *supra*, the record is plain that the Debtors' real center (including as reasonably perceived and ascertained by third parties) is in the BVI.

## VI. The Location Of Tangible Assets Does Not Defeat And In Fact Supports BVI COMI.

33.      Contrary to the Morning Mist Plaintiffs' assertion, the location of Sentry's tangible assets -- its cash -- supports a BVI COMI.  As an initial matter, to the best of the Petitioners' knowledge, Sentry does not have *any* tangible, liquid assets in the United States, nor did it have any such assets in the United States as of the filing date.  See Krys Reply Dec. at ¶ 29. That fact strongly refutes the Morning Mist Plaintiffs' argument that Sentry's COMI is in the United States.

34.      As set forth in the Krys Declaration, approximately $17 million of Sentry's cash was, as of the date of the Sentry Verified Petition, located in BVI accounts.  See Krys Initial Dec. ¶ 37.[11]  Relying on the Bear Stearns decision, the Morning Mist Plaintiffs ask the Court to disregard the BVI venue of these funds because those funds were transferred to the BVI after the BVI Proceedings were commenced.  However, Bear Stearns provides the Morning Mist Plaintiffs no support on this point because, as explained above, in that case, the Chapter 15 petition and the foreign proceeding were commenced on the same day, and the District Court clearly held that the transfer of funds to the Cayman Islands should be disregarded for COMI purposes in Bear Stearns because the funds transfer occurred *after* the Chapter 15 filing.  See discussion, *supra*.  Here, the Debtors' Chapter 15 petitions were filed almost one year *after* the BVI Proceedings were commenced and *after* tangible assets reached the BVI.

35.      Moreover, in Bear Stearns, prior to the filing of the Chapter 15 petitions and subsequent transfer of funds to the Cayman Islands, *all* of the debtors' liquid assets were held in the United States, where the debtors' COMI was determined to be located.  See 374 B.R. at 129.

---

[11]   Approximately $3 million of Sigma's cash was, as of the time of the filing of the Chapter 15 petitions, held in BVI accounts.  See id.  To the best of the Petitioners' knowledge, Lambda has no tangible assets.

23

Here, at the time of the BVI petitions for the Liquidators' appointment in April 2009, almost all of Debtors' liquid cash was located in Ireland, a jurisdiction that clearly was not the Debtors' COMI. <u>See</u> Krys Reply Dec. ¶ 29. Moreover, other tangible assets of the Debtors, as recognized by the Morning Mist Plaintiffs, are located in Ireland and in England (at the time of the BVI petitions for the Liquidators' appointment in April 2009, almost all of Debtors' liquid cash was located in Ireland). <u>See</u> <u>id.</u> As noted, the Petitioners do not have knowledge of any tangible assets of the Debtors that are located in the United States. The Morning Mist Plaintiffs do not, nor could they, argue that either Ireland or England is the Debtors' COMI. Notably, Sentry's liquid assets in Ireland are comprised of $73 million in a bank account that is subject to an attachment in favor of two Sentry investors. <u>See</u> <u>id.</u> As discussed above, on July 12, 2010, the Petitioners commenced proceedings in the High Court of Ireland to obtain a declaration that these funds properly belong to Sentry and, if successful in those efforts, intend to seek to have those funds transferred to the BVI. <u>See</u> <u>id.</u>

36.      The location of significant tangible assets in the BVI under the control and

management of the Petitioners, and the lack of any tangible assets in the jurisdiction where the objectors claim COMI to be, demonstrates a BVI COMI. See In re Saad Investments Finance Company (No. 5) Limited, Case No. 09-13985 (KG) (Bankr. D. Del. 2009), Hearing Tr. 10, 15-17, 20 (Dec. 4, 2009) (granting foreign main recognition where "all decisions, all of it, you know, the brain of this company has been in the Cayman Islands" following the appointment of receivers); see also Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd., No 09 Civ. 9021, 2010 WL 1779282, at * 14 (S.D.N.Y. April 29, 2010) (observing that chapter 15 recognition of the fund's BVI liquidation proceeding would be problematic where the "remaining funds, amounting to some U.S. $307 million, are currently held in a bank in Boston, Mass[.]"); see also Bear Stearns, 389 B.R. at 338-39 (affirming the Bankruptcy Court's denial of recognition where there were no assets in the Cayman Islands as of the Chapter 15 petition date).

## VII.    Sentry's Memorandum of Association Does Not Defeat a BVI COMI.

37.    The Morning Mist Plaintiffs further argue that Sentry's Memorandum of Association ("MOA") a finding of COMI in the BVI, primarily because the MOA restricts Sentry from "carrying on business with persons resident in the British Virgin Islands." See Milberg Objection ¶ 41. This argument fails because the MOA in no way restricts the conduct of COMI-determinative activities in the BVI, including management activities and the maintenance and administration of assets. For example, and as acknowledged by the Morning Mist Plaintiffs, the MOA does not restrict Sentry from holding board meetings in the BVI or maintaining bank or brokerage accounts in the BVI. Indeed, from December 2008 through July 2009, when the Petitioners were appointed as Liquidators, Sentry's board held 41 meetings that were originated telephonically by Sentry's counsel, Conyers Dill & Pearman ("CDP"), at CDP's offices in Tortola, BVI. See Minutes of Meetings of the Board of Directors of Sentry held between

December 18, 2009 and July 10, 2009, true and accurate redacted copies of which are attached as Exhibit A to the Thomas Declaration, filed contemporaneously herewith.

38.     Moreover, the MOA does not restrict any of the activities of the Liquidators in the BVI in furtherance of the liquidation of Sentry.  Since their appointment, the Liquidators have managed the affairs of Sentry within the BVI, including at Krys & Associates' BVI offices and before the BVI Court.  There is nothing in the MOA that precludes the Petitioners from directing, controlling, or coordinating the affairs of Sentry in the BVI, and they have done so unimpeded and unimpaired since their appointments.

## VIII.   Mr. Krys's Connections To The Cayman Islands Are A Red Herring.

39.     The Morning Mist Plaintiffs' contention that "much of petitioners' work…is conducted in the Cayman Islands" is predicated on distortions of the record and facts having no significance to COMI.  See Milberg Objection § F.    For example, the Morning Mist Plaintiffs point to the fact that Mr. Krys has dual residency in the BVI and Cayman Islands, which is unremarkable given that he is the owner of both Krys & Associates (BVI) Ltd. and Krys & Associates Cayman Limited.  See Krys Dep. Tr. 6-7.  In any event, Mr. Krys testified at his deposition that he currently spends more than twice as much time in the BVI than in the Cayman Islands.  See id. ("Q. How much time do you presently spend living in that home in the Cayman Islands as opposed to the BVI?  A. Less.  Cayman, right now, probably three days out of a month.  BVI, probably six to eight days out of the month.").  That his firm's website indicates his affiliation with the Cayman Islands office and "an old [business] card" (see Krys Dep. Tr. 10) lists a Cayman Islands address are similarly trivial and inconsequential.  Moreover, the fact that a letter to Sentry investors listed a Cayman Islands fax number hardly proves that "petitioners have largely used K&A Cayman's office."  See Milberg Objection ¶ 55. Finally, as Mr. Krys made

clear at his deposition, the "administrative function" performed by K&A's Cayman Islands office merely refers to billing and invoicing matters. See Krys Dep. Tr. 10 ("Our administrative function for all four offices is run out of the Cayman Islands, but the actual time is accumulated from the staff in BVI. They log it there, it's collected in Cayman, and then the bill is issued by the BVI office.").

40.     To be sure, the Liquidators are supported by employees in Krys & Associates' Cayman Islands office. However, and as explained in the Krys Reply Declaration, the bulk of the Liquidators' work is being performed in the BVI by management-level employees of Krys & Associates. See Krys Reply Dec. ¶ 18. Significantly, the Morning Mist Plaintiffs do not, nor can they, argue that services provided to the Liquidators through Cayman office impact on third parties' perceptions that Sentry is based in the BVI. To this point, counsel for nine of the petitioning investors first approached Christopher Stride – who is based in the BVI full time – to serve as a liquidator for Sentry, and only reached out to Mr. Krys after being advised that the size of Sentry's liquidation would require two liquidators. See Boruchow Dec. ¶ 6.

IX.     **Sentry's Share Register Does Not Point to a U.S. COMI.**

41.     The Morning Mist Plaintiffs argue that Sentry's share register points to a U.S. COMI because Sentry's U.S. based record shareholders hold 9.89% of Sentry's equity – less than the equity held by shareholders located in both Ireland and Switzerland, and Sentry's 195 record shareholders in the United States represent, based on the Morning Mist Plaintiffs' calculations, 17% of all record shareholders. As an initial matter, those figures, on their face, merely represent *a small fraction* of Sentry's total investors.

42.     That Sentry's investors have a relatively small U.S. presence is further evidenced by the large number of foreign (i.e., non-U.S.) investors that are subject to actions to claw back

27

redemption payments, as reflected in the *List of Administrators, Parties and Entities Pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(4) of Foreign Representatives Kenneth Krys and Christopher Stride*, attached as Exhibit 3 to the Sentry Verified Petition. As of the date of the Petitions, approximately 85% of actions against redeemers were directed at non-U.S. defendants.

**X.      The Isolated Meetings Referenced By The Objectors Do Not Show a U.S. COMI.**

43.      Perhaps the most striking example of the Morning Mist Plaintiffs' misplaced reliance on events that should have no part in a COMI analysis is the attempt to support their position by reference to certain meetings held outside the BVI.  See Milberg Objection, §§ H and I.  Among other things, the Morning Mist Plaintiffs highlight the fact that a meeting of creditors and shareholders was held in New York.  See id. ¶ 64.  However, that meeting was also held in London (which was connected to New York by videoconference), a fact that the Morning Mist Plaintiffs bury in a footnote.  New York and London are well-recognized as the world's major financial centers, and Mr. Krys testified that the location was chosen because "that would be central to the *large global community of investors* that we have."  Krys. Dep. Tr. 48 (emphasis supplied).  In other words, the fact that the Liquidators chose to hold this meeting in New York and London simply reflects that Sentry's investors are scattered across a number of jurisdictions.

44.      To further support their U.S. COMI argument, the Morning Mist Plaintiffs point to the fact that certain other meetings, namely with Sentry's former directors, FGG and the BLMIS Trustee, were held outside of the BVI.  However, the Morning Mist Plaintiffs do not mention that one of these meetings, with the former directors, was held in *Europe* – not in New York*.  See* Krys Dep. Tr. 218.  They also fail to mention the meetings that actually occurred in the BVI, including several in-person meetings with representatives of Sentry's Liquidation Committee (several of which representatives are BVI based)*.  See* Krys Dep. Tr. 52 ("we've had

28

some person-to-person, face-to-face meetings in BVI as well.  Q.  How many?  A.  I would say like a couple.").  The Morning Mist Plaintiffs' cherry-picked list of isolated meetings held outside of the BVI does not come close to rebutting the presumption or the ample proof submitted that Sentry's COMI is in the BVI.

## XI.   The Petitioners Have Engaged In Substantial Efforts To Bring Sentry's Books and Records to the BVI.

45.     The Morning Mist Plaintiffs' assertion that "Sentry maintains few books and records in the BVI" also rings hollow.  See Milberg Objection ¶ 70.  As noted, the Petitioners, since their appointment as Liquidators, have undertaken substantial efforts to reconstruct the records of the Debtors and bring those records to the BVI.  The Petitioners' ongoing discussions and agreements with Citco (the Debtors' administrative agent), FGG (the Debtors' former investment manager) and former auditors of the Debtors have resulted in the transfer of significant fund records – *including the share register* – to the BVI.[12]  See Krys Reply Dec. at ¶ 18.  Many of these records are being stored in premises in the BVI leased by the Debtors.  See Krys Reply Dec. ¶ 19.[13]

## XII.   The Choice of Law Provisions In Sentry's Agreements Do Not Defeat a BVI COMI.

46.     The Morning Mist Plaintiffs' argument that Sentry's contracts, and specifically their choice of law provisions, point to a U.S. COMI is entirely refuted by the contracts on which the Morning Mist Plaintiffs rely.  Of the many contracts referenced by the Morning Mist Plaintiffs, only two contain New York choice of law provisions:  (i) Sentry's Subscription

---

[12]   The Milberg Objection misleadingly suggests in footnote 25 that the Share Register is still maintained by Citco outside of the BVI, which is not the case.

[13]   The Morning Mist Plaintiffs make much of the fact that, as of the time of his deposition, Mr. Krys had not visited the leased property.  See Milberg Objection ¶ 72.  That fact has no import here, given that a team of professionals at Krys & Associates' BVI offices is assisting the Petitioners with their duties as Liquidators, including the review and maintenance of the Debtors' books and records.

Agreements, which were entered into well before the Liquidators' appointment, and (ii) [          ]

[                                                  ] The majority of the contracts cited by the Morning

Mist Plaintiffs are governed by non-US law:

- The administration agreements with Citco are governed by <u>BVI law</u>.

- Sentry's agreement with its former investment manager, Fairfield Greenwich (Bermuda) Ltd., is governed by <u>Bermuda law</u>.

<u>See</u> Milberg Objection ¶¶ 83-85; <u>see also</u> Krys Reply Dec. ¶ 27 and Exhibits M (a schedule of

certain agreements known to the Liquidators executed by or on behalf of Sentry before the

disclosure of the Madoff fraud) and O (a schedule of certain agreements executed by or on behalf

of the Liquidators following their appointment).[14]

47.     The choice of law provisions in the contracts entered into by the Debtors prior to

the Madoff fraud disclosure and subsequently by the Liquidators (on behalf of the Debtors)

reflect the international scope of Sentry's and the Debtors' business and the Petitioners' activities

in furtherance of Sentry's liquidation.  If anything, they are, by themselves, indeterminative of

COMI (i.e., they are COMI neutral), although many of the agreements contain BVI choice of

law.  These agreements do not change the fact that the Debtors' headquarters are in the BVI, and

---

[14]     Indeed, many of the named defendants sued by the Morning Mist Plaintiffs in the derivative action have agreements with Sentry that call for the application of non-New York or non-United States law: (i) the investment management agreement with the FGG investment manager is governed by Bermuda law; (ii) the administration and custodian agreements with the Citco entities are governed, respectively, by BVI and Dutch law; and (iii) the engagement agreements with the Canadian and Netherlands PricewaterhouseCoopers entities are governed, respectively, by Ontario and Dutch law. Krys Reply Dec. ¶ 27 and Exhibit M.  The Milberg Objection fails to inform the Court of these facts.

they certainly do not support a COMI determination in the U.S.[15]

## XIII. All Legal Work For the BVI Proceedings Is Performed In the BVI.

48.     Without facts to support their position, the Morning Mist Plaintiffs espouse the blatant falsehood that legal work in connection with the BVI Proceedings is being performed in New York by Brown Rudnick. Milberg Objection ¶ 86.  Brown Rudnick was retained by the Petitioners as *U.S. counsel* to handle *U.S. matters* in connection with the Debtors' liquidation. See Krys Reply Dec. ¶ 11; Hare Reply Dec. ¶¶ 3 & 13.[16]  The Liquidators have retained a separate law firm, Forbes Hare, as BVI counsel in respect of the BVI Proceedings and to coordinate international matters relating thereto.  See Krys Reply Dec. ¶ 11, 21-22.  The Forbes

---

[15]   The Morning Mist Plaintiffs try hard to impugn the credibility of the Petitioners by accusations that the Liquidators have engaged in a "cherry-picking strategy" by not referencing [                    ] [                    ] in their original supporting papers.  See Milberg Objection ¶ 83.  This is yet another attempt by the Morning Mist Plaintiffs to cloud the issues. [                    ]

[                    ] Continuing their pattern of gasping at straws, the Morning Mist Plaintiffs then make a gratuitous and inapposite reference to the concerns raised by the Court as to the strategic basis of the petition in the SPhinX case.  In SPhinX, Mr. Stride, as liquidator, was simply hesitant to disclose litigation strategy, not facts.  See In re SPhinX, Ltd., 351 B.R. 103, 121 (Bankr. S.D.N.Y. 2006) ("However, a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper: that is, it has the purpose of frustrating the RCM [Refco Creditors Committee] Settlement [with SPhinX] by obtaining a stay of the appeals upon the invocation of Bankruptcy Code section 362(a) that would go into effect under section 1520(a)(1) upon such recognition.  See Tr. at 87, at which counsel for the JOLs reluctantly admitted this strategy, after considerable efforts by Mr. Stride and his counsel to obfuscate it. . . ").

[16]   The Morning Mist Plaintiffs have, in bad faith, misrepresented the deposition testimony of Ken Krys to support their position.  See Milberg Objection ¶ 86 (citing testimony that "[t]he primary work is being done out of New York").  However, that testimony was provided in response to the following question and its clear context:

Q.      Is the work that Brown Rudnick is doing for the Sentry liquidation being done out of the New York City offices of Brown Rudnick?

A.      The primary work is being done out of New York, yes.

Krys Dep. Tr. 19.  Thus, as counsel to the Morning Mist Plaintiffs well know, when Mr. Krys testified that the "primary work is being done out of New York," he was simply referring to the location of the office of Brown Rudnick where *Brown Rudnick's work was being performed*, not the location where work relating to the BVI proceedings was being  performed.

Hare attorneys working on these matters are all resident in Forbes Hare's Tortola, BVI offices. See id. at ¶ 22; Hare Reply Dec. at ¶ 3. In the 11 months since the Petitioners' appointment as Liquidators of the Debtors, Forbes Hare has performed substantial work in connection with the BVI Proceedings, as more fully described in the Hare Reply Declaration. In addition to coordinating legal strategy (in the BVI and internationally) and advice in the foreign litigations described above, the following chart lists a summary of the various applications that Forbes Hare, at the direction of the Petitioners, have submitted to BVI Court and the corresponding orders:

| Date of Order | Summary of Application to BVI Court and Order made |
|---|---|
| 09.22.09 | Liquidators given leave to:<br>1) File protective claim forms in the BVI against redeemers (the "BVI Redeemer Claims");<br>2) Instruct Brown Rudnick to defend the Trustee's adversary proceedings against Sentry;<br>3) Instruct Brown Rudnick to take certain steps (i.e. to make certain filings) in the New York Derivative Action and the Sentry Direct Action (defined below). |
| 10.09.09 | Liquidators given leave to file further BVI Redeemer Claims. |
| 10.13.09 | Liquidators given leave to take further steps in Morning Mist. |
| 10.27.09 | Liquidators given:<br>1) directions relating to the BVI Court's review and approval of the Liquidators' (and their advisers') remuneration;<br>2) leave to instruct Brown Rudnick to take certain steps in Morning Mist'<br>3) leave to instruct Brown Rudnick to oppose any and all attempts by members or purported members of the Funds to bring putative derivate actions in the US. |
| 11.04.09 | Liquidators given leave to:<br>1) file further protective BVI Redeemer Actions;<br>2) take certain steps in the Sentry Direct Action. |
| 11.13.09 | Liquidators given leave to instruct Brown Rudnick to take steps in relation to the opposition of the Net Equity determination. |
| 11.17.09 | BVI Court approval for the remuneration of the Liquidators and their counsel for fees and disbursements. |
| 12.16.09 | 1) Liquidators given leave to instruct Brown Rudnick to take certain steps in the Sentry Direct Action.<br>2) BVI Court directs sealing of all related proceedings in BVI. |
| 02.15.10 | 1) BVI Court approval for the remuneration of the Liquidators and their counsel for fees and disbursements.<br>2) Liquidators given leave to instruct Brown Rudnick to maintain the status |

32

| | |
|---|---|
| | quo in the US.<br>3) Liquidators given directions by the BVI Court on the process for and extent to which Liquidators are to consult with the Liquidation Committee.<br>4) Liquidators given directions on notice requirements.<br>5) Liquidators given leave to enter a settlement agreements in relation to Dutch pre-judgment attachment orders directed against Sentry's assets maintained at the Dublin branch of CDN. |
| 03.24.10 | Liquidators given leave with respect to conducting certain activities in Canada and the Netherlands concerning, respectively, PwC LLP (Canada) and PwC Accountants NV (Netherlands). |
| 03.31.10 | Liquidators given directions in respect of formal requests for information and documents from PwC entities. |
| 04.12.10 | Liquidators given leave to file claims against redeemers in the state of New York. |
| 05.07.10 | Liquidators given leave to file for Chapter 15 recognition in the United States. |
| 05.13.10 | Leave given to a shareholder in Sentry to change the custodian of its shares (as the leave of the BVI Court to perform this action is required pursuant to section 175 of the Insolvency Act). |
| 06.08.10 | 1) Liquidators given leave to seek recognition of BVI proceedings in Ireland and to regain control of assets maintained at Dublin branch of CDN.<br>2) Liquidators given leave to instruct Brown Rudnick to serve claim forms issued against redeemers in the State of New York.<br>3) Liquidators given leave to instruct an international process server to serve the BVI Redeemer Claims.<br>4) Liquidators given directions on certain claims in the state of New York. |
| 06.24.10 | 1) Liquidators given leave to defend proceedings commenced against Sentry in Amsterdam.<br>2) Liquidators given directions in relation to the proceedings commenced in the BVI against redeemers. |

See Hare Reply Dec. ¶ 10. As demonstrated above and more fully in the Hare Reply Declaration, Forbes Hare has done substantial work – all in the BVI – in connection with the BVI Proceedings.

**IN THE EVENT FOREIGN MAIN RECOGNITION IS
NOT GRANTED, SENTRY IS ENTITLED TO FOREIGN
NONMAIN RECOGNITION AND RELATED RELIEF**

I.    **Sentry Has An Establishment In the BVI.**

49.    The Morning Mist Plaintiffs' argument that Sentry is not entitled to foreign nonmain recognition, on the ground that it does not have an "establishment," should also be

rejected.  As with the COMI determination, "[w]hether the debtor has an 'establishment' in a country must be determined at the time of the filing of the chapter 15 petition." <u>British American</u>, 425 B.R. at 915.  Section 1502 "speaks in the present tense" and focuses the establishment inquiry on where a debtor "*has* an establishment" and "*carries* out a nontransitory economic activity." <u>Lavie v. Ran</u>, 406 B.R. 277, 284-85 (S.D. Tex. 2009), <u>aff'd</u>, 2010 WL 2106638 (5th Cir. May 27, 2010) (citing 11 U.S.C. §§ 1502(5) and 1502(2), respectively) (original emphasis).  As such, the temporal focus when assessing evidence bearing on the establishment analysis should be the chapter 15 filing date. <u>Lavie v. Ran</u>, 406 B.R. at 285 ("the court should weigh only the evidence as it exists at the time of filing in the U.S. court"); 2010 WL 2106638, at *8 ("Similar to the determination of Ran's COMI, the relevant time period to determine whether Ran has an establishment in Israel is at the time Lavie filed his petition for recognition.") (citing 11 U.S.C. §§ 1502(2), 1502(5) and Mark Lightner, <u>Determining the Center of Main Interest Under Chapter 15</u>, 17 J. Bankr. L. & Prac. 5, art. 2 (2009)).

50.     The Morning Mist Plaintiffs' assertion that Sentry does not have an establishment (<u>i.e.</u>, a "local place of business") in the BVI mistakenly assumes that the Petitioners are relying solely on the fact that the BVI proceedings are pending in the BVI to support the existence of an establishment.  However, in this case, there is more than that.  As discussed *supra*, and as set forth in the Krys Reply Declaration, the Petitioners are conducting substantial, ongoing business activity at and within the BVI offices of Krys & Associates.  Although Sentry itself has no employees, Krys & Associates' BVI offices employ a number of individuals that are working on Sentry's liquidation.  Moreover, Sentry is a party to contracts with several BVI businesses, including Forbes Hare, BVI legal advisors to the Petitioners, Codan Trust Company (BVI) Ltd., registered agent for the Debtors, and Codan Managments (BVI) Ltd., registered secretary for the

Debtors, and an additional lease with a BVI company for the purpose of storing books and records in the BVI.  See Krys Initial Dec. ¶ 46(p); Krys Reply Dec. ¶ 27.

51.     Consistent with the U.S. Supreme Court <u>Hertz</u> decision discussed above, the Debtors not only have a place of business within the BVI, they have their *principal* place of business there.  The facts here are thus plainly distinguishable from the <u>Ran</u> case (the case the Morning Mist Plaintiffs primarily rely upon), where the individual debtor had no current ties to jurisdiction of the foreign proceeding (Israel) other than the fact that the proceeding was pending there.  <u>See</u> <u>Ran</u>, 2010 U.S. App. LEXIS 10882 at *12.

52.     As the District Court observed in <u>Bear Stearns</u>, "[i]f the debtor does not *have* its center of main interests or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding.  Implicitly, in such an instance, the debtor's liquidation or reorganization should be taking place in a country other than the one in which the foreign proceeding was filed to be entitled to assistance from the United States."  <u>Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.</u>, 384 B.R. 325, 334 (S.D.N.Y. 2008) (emphasis supplied).  Accordingly, a conclusion that the Debtors do not have their COMI or an establishment in the BVI (a conclusion that would be unsupported by the record) would infer that the Debtors' liquidation should be based in some other jurisdiction.  Without any management, tangible assets or a place of business located in the United States, it cannot be said the United States is the proper forum for the Debtors' liquidation, and there is no suggestion that any other jurisdiction would be an appropriate forum.

**II.     Upon Foreign Nonmain Recognition, The Morning Mist Action Should Be Stayed Pursuant to Section 1521.**

53.     The Morning Mist Plaintiffs further argue that, if the Petitioners are granted

foreign nonmain recognition, the Morning Mist Action should not be stayed under Section 1521(a)(1). In the event that this Court grants foreign nonmain recognition, a stay of the Morning Mist Act is, without question, "necessary to effectuate the purpose of [Chapter 15] and *to protect the assets of the debtor or the interests of the creditors.*" See 11 U.S.C. § 1521(a) (emphasis supplied). As discussed below, the Morning Mist Plaintiffs are, in disregard of applicable BVI law, seeking to prosecute claims belonging to Sentry that they have no standing to assert. As such, they are placing valuable assets of Sentry in jeopardy, to the detriment of Sentry's stakeholders. The Morning Mist Action should therefore be stayed to allow the Petitioners to pursue and liquidate the claims asserted therein for the benefit of all Sentry's stakeholders.[17]

## RECOGNITION, ALONG WITH THE RELATED STAY OF THE MORNING MIST ACTION, IS ENTIRELY CONSISTENT WITH PUBLIC POLICY.

54. Perhaps the most frivolous and plainly erroneous argument advanced by the Morning Mist Plaintiffs is that recognition of Sentry's BVI proceeding would be contrary to public policy. The Morning Mist Plaintiffs correctly note that the public policy exception of Section 1506 must be "narrowly construed," and only applies "if the action would be manifestly contrary to the public policy of the United States." Indeed, "the exception is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for

---

[17] The Morning Mist Plaintiffs make a weak argument that the Morning Mist Action should not be stayed if foreign nonmain recognition is granted because that action does not "relate[] to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c). In support of this argument, the Morning Mist Plaintiffs falsely claim that the Morning Mist Action "has no relationship (direct or otherwise) with the foreign proceeding or any Sentry assets in the BVI." See Milberg Objection ¶ 94. Sentry's claims against FGG and its former service providers are material assets of Sentry and, moreover, those claims are based on BVI law. Any recoveries from those claims are properly distributed in the BVI proceedings. The fact that the Morning Mist Plaintiffs have improperly and without legal authority sought to control the prosecution of those claims by commencing suit in New York does not put them outside the ambit of Section 1521(a).

the United States." <u>Ran</u>, 2010 U.S. App. LEXIS 10882 at *7.

55.     To support their public policy argument, the Morning Mist Plaintiffs disingenuously assert that, if Sentry's Chapter 15 petition is granted, claims asserted against Sentry would go forward, and claims on behalf of Sentry would be stayed.   <u>See</u> Milberg Objection ¶ 97.  As explained below, this assertion completely ignores the facts, the law, and the circumstances surrounding both the BLMIS Adversary Proceeding and the Morning Mist Action. In fact, the Morning Mist Plaintiffs' public policy argument makes plain why recognition of Sentry's BVI proceeding and related relief under Chapter 15 are necessary.

I.      **A "Carve-Out" Of The BLMIS Adversary Proceeding**
        **From The Automatic Stay Is In The Interests Of Sentry's**
        **Stakeholders And Is Not Inconsistent With Public Policy.**

56.     As discussed in the Krys Initial Declaration, the Petitioners and the BLMIS Trustee have been engaged in good faith, bilateral settlement discussions concerning the BLMIS Adversary Proceedings.   <u>See</u> Krys Initial Dec. ¶ 40.   The BLMIS Trustee has, on several occasions, agreed to extend Sentry's time to respond to that litigation to facilitate those discussions, resulting in what amounts to a consensual, "de facto" stay.  <u>See</u> Krys Initial Dec. ¶ 40.  In view of these circumstances, as an exercise of their business judgment, the Petitioners have determined that seeking a formal stay of the BLMIS Adversary Proceeding at present is not in the best interests of Sentry's creditors and other stakeholders.

57.     Absent the arrangement proposed by the Petitioners, the Petitioners could become embroiled in wasteful, unnecessary and value destructive litigation as to whether the BLIMS Trustee should be granted relief from the automatic stay – at the ultimate expense of victims of the Madoff fraud.   Given the status of discussions between the Petitioners and the BLMIS Trustee, the Petitioners consider it advisable to maintain the *status quo* among the parties.  <u>See</u>

Krys Reply Dec. ¶ 32.  Moreover, the Petitioners have fully reserved their right to seek to impose the stay against the BLMIS Trustee in the future, protecting Sentry's estate in the event that discussions among the parties do not lead to a consensual resolution of the BLMIS Adversary Proceeding and related matters.  See id.

58.    It is thus plain that the proposed arrangement between the BLMIS Trustee and the Petitioners is not "manifestly contrary" to a "fundamental policy" of the United States. Significantly, this arrangement has nothing to do with the enforcement of a foreign judgment or the recognition of a foreign proceeding, instances in which the public policy exception may have relevance.  Cf. In re Ephedra Prods. Liability Litigation, 349 B.R. 333, 336 (S.D.N.Y. 2006) ("Determining what *foreign* procedures are 'manifestly contrary to the public policy of the United States' is, moreover, familiar territory to federal courts, who have long had to confront similar issues when determining whether or not to enforce *foreign* judgments rendered on the basis of *foreign* proceedings that were plainly fair but that *did not include some commonplace of American practice*.") (emphasis supplied).

59.    Here, the arrangement whereby the BLMIS Trustee would be conditionally exempted from the automatic stay is the consensual resolution of matter within these *U.S.* Chapter 15 proceedings, and is entirely consistent with U.S. bankruptcy policy which favors compromise over protracted litigation.  See Federal Rule of Bankruptcy Procedure 9019; see also Wm. Cameron & Co. v. Gresham (In re Gresham), 2006 U.S. Dist. LEXIS 74286, *11-14 (N.D. Tex. 2006) ("The strong policy favoring consensual dispute resolution in bankruptcy litigation must be considered."); Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 94 (D. Del. 2006) (noting "the important policy of promoting settlements in bankruptcy proceedings").  In other words, there are no Section 1506 issues that

arise from the Petitioners' exercise of their informed business judgment with respect to their dealings with the BLMIS Trustee.

## II.    A Stay Of The Morning Mist Action Is Entirely Appropriate, As Well As Necessary, To Protect Sentry's Estate.

60.    With respect to the Morning Mist Action, it is entirely appropriate for that action to be stayed upon recognition of Sentry's BVI proceeding as a foreign main proceeding.  In fact, that is the result mandated by the Bankruptcy Code, which makes the automatic stay of Section 362 applicable to all property of the debtor in the United States upon foreign main recognition. See 11 U.S.C. § 1520(a)(1).  It is well-settled law that a derivative action is property of a debtor's estate.  See, e.g., In re General Growth Props., Inc., 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) ("[I]t is well settled that alleged acts of breach of fiduciary duty, corporate waste and mismanagement ... become property of the estate immediately upon the commencement of a bankruptcy case pursuant to § 541 of the Bankruptcy Code.") (internal quotations omitted). Accordingly, the prosecution of derivative actions is prohibited by the automatic stay.  See 11 U.S.C. § 362(a)(3) (staying "any act …to exercise control over property of the estate"); see also General Growth Props., 426 B.R. at 76 ("As claims of the bankruptcy estate, only the trustee can bring them and [the derivative plaintiff] no longer owns them nor can [the derivate plaintiff] assert them.") (internal quotations omitted).  In other words, a stay of the Morning Mist Action upon recognition would not be contrary to the public policy of the United States; quite to the contrary, it would be a result that is routine and specifically contemplated under United States law.  Once the Morning Mist Action is stayed, the Liquidators will evaluate the claims asserted therein and make an informed judgment regarding the manner and extent to which those claims will be pursued by the Liquidators.

61.    Accordingly, if the Petitioners satisfy the requirements for foreign main

recognition (which they do), this Court does not need to even entertain the Morning Mist Plaintiffs' spurious pronouncement that they, and not the Liquidators, are better equipped to pursue Sentry's claims. See Milberg Objection ¶ 98 ("Additionally, the [Morning Mist Action] is far more comprehensive and seeks substantially larger recoveries than the Direct Action (which seeks only the recovery of certain fees). Recognition, thus, could well result in severely limiting recoveries on behalf of Sentry."). Nevertheless, the Petitioners deem it prudent to respond to such pronouncements.

62. What the Morning Mist Plaintiffs elide is that they have improperly commenced the Morning Mist Action in violation of controlling BVI law, lacked standing to bring it at the time it was commenced and, in any event, cannot now obtain or exercise the authority to prosecute it. The hubris and recklessness of their attorneys in prosecuting those claims interfere with Sentry's orderly liquidation.

63. Section 184(C) of the BVI Business Companies Act ("BVI BC Act"), entitled Derivative Actions, makes clear that a shareholder of a BVI corporation has no power or authority to initiate litigation purportedly for or on behalf of a corporation unless the shareholder has obtained formal judicial authority by way of application to the High Court of the British Virgin Islands (the "BVI High Court") to derivatively commence such an action. Hare Reply Dec. ¶ 12. Additionally, the provisions of the BVI BC Act unambiguously make the BVI High Court the only court that shareholders may petition for leave to bring a derivative action on behalf of a BVI company. See BVI BC Act §§ 2 ("Court means the High Court") and 184C(6) ("Except as provided in this section [i.e., 184C], a member is not entitled to bring or intervene in any proceedings in the name or on behalf of the company."). Accordingly, under section 184(C), the Morning Mist Plaintiffs were obligated to apply to the BVI High Court for leave to bring the

40

Morning Mist Action, which they failed to do. Hare Reply Dec. ¶ 15; see Bruhl v. Kingate Global Fund, Ltd., Index No. 601526/2009 (N.Y. Sup. Ct. Jan. 25, 2010) (denying petition of shareholder of BVI company to commence a derivative action on the grounds that BVI law applied to shareholder's derivative action and that section 184(C) of the BVI BC Act required the shareholder to obtain the approval of the BVI High Court, which the shareholder failed to do).[18]

64.     Because the Morning Mist Plaintiffs failed to apply to the BVI High Court for leave as required by section 184(C) of the BVI BC Act, they did not have authority or standing to commence the Morning Mist Action in the NY Supreme Court. See Hare Reply Dec. at ¶ 22. Moreover, the Morning Mist Plaintiffs made no showing, as required by section 184(C)(3) of the BVI BC Act, that Sentry's Board of Directors did not intend to commence any actions on Sentry's behalf, or that it would have been in Sentry's best interests not to allow the Board of Directors or shareholders as a whole to pursue such actions.[19]    See id.    By reason of the foregoing, the Morning Mist Action was improperly commenced and the Morning Mist Plaintiffs' argument that the Morning Mist Action is properly maintainable by them in the NY Supreme Court is plainly wrong and contradicted by the express provisions of the BVI BC Act.

___

[18]    The Morning Mist Plaintiffs attempt to distinguish the Kingate case on the ground that, in that case, the liquidators of the fund had already been appointed when the derivative action was commenced. However, that is a meaningless distinction because, as the Court made clear in Kingate, whether or not the Liquidators were in place at time when the Morning Mist Action was filed, the only way that the Morning Mist Plaintiffs would have standing to bring that action is if the BVI High Court expressly granted them standing (which, in light of the Liquidators' subsequent appointment, cannot be granted as a matter of law). See Krys Initial Dec., Ex. B at p. 9.

[19]    In fact, Sentry has at all times fully reserved its rights regarding the impropriety of the putative shareholders' actions and their lack of standing to assert claims on behalf of Sentry. On May 29, 2009, Sentry, acting at the direction of its Board of Directors, commenced an action in the Supreme Court of the State of New York, New York County, styled Fairfield Sentry Limited v. Fairfield Greenwich Group, et al. (the "Sentry Direct Action"), Index No. 601687/2009, in which it asserted claims for breach of contract, breach of fiduciary duty, unjust enrichment, rescission and other statutory and equitable claims against Fairfield Greenwich Bermuda and other affiliates of FGG (the same defendants as in the Morning Mist Action). See Hare Reply Dec. ¶ 33.

65.     In addition to lacking the authority and standing at the time the Morning Mist Action was commenced, the Morning Mist Plaintiffs are now prevented from maintaining the Morning Mist Action in the NY Supreme Court due to the appointment of the Liquidators by the BVI Court.  Upon their appointment by the BVI Court, the Liquidators assumed, among other things, sole custody and control of the Debtors' assets and the power to do all acts in the name and on behalf of the Debtors, including the commencement of litigation. See Hare Reply Dec. ¶ 24 (citing to section 175(1)(b) of the Insolvency Act of the British Virgin Islands, 2003 (the "Insolvency Act")).  Moreover, under the Insolvency Act, the commencement of a liquidation proceeding supervenes any right of a shareholder to seek, pursuant to section 184C(1) of the BVI BC Act, authority to prosecute claims belonging to the corporation in liquidation, such as the Morning Mist Action. Id. ¶ 25; see also Insolvency Act § 176(c)(ii) ("unless the Court otherwise orders, no person may […] exercise or enforce or continue to exercise or enforce any right or remedy over or against assets of the company[.]").

66.     Accordingly, under BVI law, and pursuant to the BVI Court's orders appointing the Liquidators, the Liquidators now have the *sole authority* to prosecute claims on behalf of the Debtors, including those claims asserted on behalf of Sentry in the Morning Mist Action, which the Liquidators intend to pursue for the benefit of all of Sentry's stakeholders. Hare Reply Dec. ¶ 25.  By reason of the Liquidators' appointment over Sentry, any claims for recovery of assets or remedies that the Morning Mist Plaintiffs may assert against, or on behalf of, Sentry are now governed by the Insolvency Act and are required to be dealt with in the BVI Proceedings.  See id.  Therefore, the Morning Mist Plaintiffs are incapable of pursuing the Morning Mist Action in the NY Supreme Court.

67.     Even if foregoing facts did not completely contravene the Morning Mist

Plaintiffs' ability to pursue the Morning Mist Action (which they do), the Morning Mist Plaintiffs would nevertheless be unable to successfully petition the BVI High Court for leave to pursue the Morning Mist Action on behalf of Sentry because they are not registered shareholders of Sentry. As more fully described in the Hare Reply Declaration, the BVI BC Act provides that only a registered shareholder (*i.e.*, a shareholder listed on Sentry's register of members) may apply to the BVI High Court for leave to bring a derivative action on behalf of the company. See id. ¶¶ 29-30.

68.                               Therefore, the Morning Mist Plaintiffs clearly do not even have the standing to apply to the BVI High Court for leave to bring the Morning Mist Action.

69.     Based on the foregoing, it is plain that the Morning Mist Plaintiffs and their counsel are unlawfully, inappropriately and recklessly interfering with a valuable asset of the estate – Sentry's claims against its former managers, administrators and accountants. The Petitioners are the only parties that can assert those claims under applicable (BVI) law. The stay of the Morning Mist Action that would be automatic upon foreign main recognition will protect and preserve a valuable estate asset and, therefore, is entirely consistent with the purposes of

Chapter 15. See 11 U.S.C. § 1501(a)(3) and (4) (objectives of Chapter 15 include the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor" and the "protection and maximization of the value of the debtor's assets."). Finally, the claim by the Morning Mist Plaintiffs that their action is "more comprehensive" (i.e., better) that the pending direct action against the FGG defendants (which is controlled by the Liquidators) is without any merit. Among other things, (i) the Liquidators have tolling arrangements with most of the other defendant groups being sued by the Morning Mist Plaintiffs; (ii) the Liquidators are proceeding in an orderly and deliberate manner, using tools available to them to obtain documents and information, (iii) the Liquidators, unlike the Morning Mist Plaintiffs, are cognizant that mis-prosecution of claims can result in substantial prejudice to the investors and stakeholders of Sentry through increased indemnification claims against the estate and loss of estate claims through dismissal motions; and (iv) the Liquidators control of Sentry's claims will benefit all investors and creditors of Sentry, not just the Morning Mist Plaintiffs. See Morgado Family Partners, LP v. Lipper, 6 Misc. 3rd 1014(A), 2004 WL 3142198, at * 5 (Sup. Ct. N.Y. County Nov. 9, 2004) (staying derivative claims in favor of claims being brought by a trustee: "[T]he Trustee, standing in the shoes of the Partnership, can assert a claim that will benefit all the partners, not just the [derivative] Plaintiffs in this lawsuit."), aff'd, 19 A.D. 3d 262, 800 N.Y.S. 2d 128 (1st Dep't 2005).

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Petitioners' MOL, the Verified Petitions filed by the Petitioners on behalf of the Debtors should be granted, and the Milberg Objection should be overruled in all respects.

Dated:   July 16, 2010
       New York, New York

**BROWN RUDNICK LLP**

By:   /s/ David J. Molton
     David J. Molton
     William R. Baldiga
     Daniel J. Saval
     May Orenstein
     Tally M. Wiener
     Seven Times Square
     New York, New York 10036
     (212) 209-4822

     *Attorneys for the Petitioners*