**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
In re:

FAIRFIELD SENTRY LIMITED, *et al.*,

    Debtors in Foreign Proceedings.

------------------------------------------------------------X

**FOR PUBLICATION**

Chapter 15

Case No. 10-13164 (BRL)

(Jointly Administered)

APPEARANCES:

BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone:   (212) 209-4800
Facsimile:   (212) 209-4801
<u>By</u>:   David J. Molton
      William R. Baldiga
      May Orenstein
      Daniel J. Saval

*Attorneys for the Foreign Representative*


QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100
<u>By</u>:   Scott C. Shelley     .
      Robert Juman

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100
<u>By</u>:   Eric D. Winston
      Shane McKenzie
      Matthew Scheck

*Attorneys for Farnum Place, LLC*

Before: Hon. Burton R. Lifland
United States Bankruptcy Judge

**MEMORANDUM DECISION AND ORDER DENYING RELIEF REQUESTED IN THE FOREIGN REPRESENTATIVE'S APPLICATION FOR CONSIDERATION OF SIPA CLAIM ASSIGNMENT TRANSACTION CONTEMPLATED BY TRADE CONFIRMATION PURSUANT TO SECTIONS 105(a), 363(b), 1507(a), 1520(a)(2) AND <u>1521(a) OF THE CODE</u>**

This is a pure and simple case of seller's remorse. A Chapter 15 foreign representative sold his Madoff SIPA[1] claim to the buyer, Farnum Place, LLC ("Farnum")[2] in an arms-length transaction following months of good faith negotiations (the "SIPA Claim Sale" or "Sale"). Unrelatedly, three days later, the Trustee administering the Madoff estate executed a multi-billion dollar settlement, significantly bolstering the value of this SIPA claim. Disheartened by his bad luck, the foreign representative scrambled to undo the Sale by any means necessary. He turned first to the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, of the British Virgin Islands (the "BVI Court"), which is overseeing the liquidation of Fairfield Sentry Limited ("Fairfield Sentry" or "Sentry"), one of the debtors[3] in the above-captioned Chapter 15 case. Consequently, the BVI Court held an in-depth, three-day, evidentiary hearing involving the testimony of multiple witnesses and experts, and ultimately found that the Sale is valid. The allowed SIPA claim is presently $230 million.

The foreign representative now turns to this Court in another attempt to undo the transaction. The instant application (the "Application")[4] of Kenneth Krys, the foreign

---

[1] Securities Investor Protection Act [hereinafter "SIPA"].

[2] Farnum is a special purpose entity created and owned by The Baupost Group LLC, which is a hedge fund with approximately $20 billion in assets under management and experience in acquisitions of distressed debt.

[3] The other two debtors in the above-captioned case are Fairfield Sentry's two sister funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda," and together with Sentry and Sigma, the "Chapter 15 Debtors" or the "Debtors").

[4] Memorandum of Law In Support of Foreign Representative's Application, Pursuant To 11 U.S.C. §§ 105(A), 363, 1507(A), 1520(A)(2) And 1521(A), For Consideration of SIPA Claim Assignment Transaction Contemplated By Trade Confirmation (Dkt. No. 593).

representative (together with his predecessors,[5] the "Foreign Representative" or "BVI Liquidator") of Fairfield Sentry seeks the disapproval of this Sale pursuant to sections 105(a), 363(b), 1507(a), 1520(a)(2) and 1521(a) of the United States Bankruptcy Code (the "Code"), asserting domestic Code section 363 concepts (best interests of the estate). However, conducting a plenary section 363 review, as urged by the Foreign Representative, is not warranted under the present circumstances because the Sale does not involve the transfer of an interest in property within the United States, as statutorily mandated by Chapter 15. Moreover, accepting such assertions would contravene the origins of Chapter 15 and the critical concept of comity embedded therein. Indeed, this Court has no further meaningful interest in the disposition of the SIPA claim, which lies at the heart of the instant Application.

Accordingly, the Foreign Representative's attempts to persuade this Court to disapprove the Sale, the *bona fides* of which are untainted by the slightest hint of fraud or foul play, are simply unavailing. The Foreign Representative challenged the validity of the Sale before his home court in the BVI and lost. His Hail Mary, last-ditch effort to renew that challenge before this Court is without any basis and is therefore DENIED.

## BACKGROUND

### 1. BVI Liquidation and Recognition

Fairfield Sentry was established for the purpose of allowing mainly non-U.S. persons and certain tax-exempt United States entities to invest with Bernard L. Madoff Investment Securities ("BLMIS"). *See In re Fairfield Sentry Ltd.*, 440 B.R. 60, 62 (Bankr. S.D.N.Y. 2010). It was a customer of and feeder fund to BLMIS, where it invested 95% of its assets, *see id.*, and maintained four direct customer accounts (nos. 1FN012, 1FN045, 1FN069, and 1FN070),

---

[5] Christopher Stride, the former BVI Liquidator of Fairfield Sentry, resigned in September 2010 and was replaced by Joanna Lau, who later resigned in November 2011.

3

*Picard v. Fairfield Sentry Ltd. et al.*, Adv. Pro. No. 09-01239, (Dkt. No. 69) [hereinafter "Settlement Motion[6]"], ¶ 6. On July 21, 2009, shortly after the revelation of Bernard L. Madoff's ("Madoff") Ponzi scheme and the collapse of BLMIS,[7] Sentry was placed into liquidation in the BVI Court. *See* Declaration of Kenneth Krys In Support of Application (Dkt. No. 591) [hereinafter "Krys Decl."], ¶ 3. On June 14, 2010, the Foreign Representative filed a petition in this Court, seeking recognition of the BVI liquidation proceedings (the "BVI Proceedings") of Sentry and its sister funds Sigma and Lambda as "foreign main proceedings" under Chapter 15.[8] *See* Krys Decl., ¶ 4. On July 22, 2010, this Court issued an order recognizing the BVI Proceedings as "foreign main proceedings" and granting other relief under Chapter 15 to the Foreign Representative (the "Recognition Order"). *See In re Fairfield Sentry*, 440 B.R. 60. The Recognition Order was affirmed in its entirety by the district court, *see In re Fairfield Sentry Ltd.*, No. 10-CIV-7311, 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011), and is currently on appeal before the Second Circuit Court of Appeals, *see* Krys Decl., ¶ 4. The Recognition Order has not been stayed, *see id.*, and remains in full force and effect, *see id.*

   2. **The Settlement and SIPA Claim**

Prior to July 2, 2009, the bar date for filing claims in the substantively consolidated SIPA liquidation of BLMIS (the "SIPA Liquidation"), Fairfield Sentry filed three customer claims (assigned claim numbers 008037, 007898 and 11251, collectively, the "SIPA Claim") in the

---

[6] Motion to Approve/Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving An Agreement By and Between the Trustee and Kenneth Krys and Joanna Lau, Solely in Their Respective Capacities as the Foreign Representatives for and Joint Liquidators of Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited.

[7] A comprehensive discussion of the facts underlying Madoff's notorious Ponzi scheme is set forth in this Court's March 1, 2010 net equity decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010) [hereinafter the "Net Equity Decision"].

[8] The BVI Proceedings were commenced on separate dates with respect to each of the Chapter 15 Debtors: Lambda on February 27, 2009, Sentry on April 21, 2009, and Sigma on April 23, 2009. *See In re Fairfield Sentry Ltd.*, 440 B.R. at 62.

4

SIPA Liquidation. *See* Settlement Motion, ¶ 10. The SIPA Claim at the time of the filing, if allowed in full, amounted to approximately $1.2 billion under the Trustee's "net equity" method for determining customer claims, as set out in this Court's Net Equity Decision. *See id.*[9]

On or about May 18, 2009, Irving H. Picard (the "Trustee"), trustee for the SIPA Liquidation, commenced an adversary proceeding (the "Adversary Proceeding") against the Chapter 15 Debtors and other defendants in this Court seeking recovery of $3.054 billion under various provisions of the Code, SIPA, and New York Debtor and Creditor Law. *See* Amended Complaint, *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-1239 (Dkt. No. 23). The Trustee also asserted claims for turnover and accounting, and for disallowance of the claims filed by the Chapter 15 Debtors, as well as threatened to seek equitable subordination of the SIPA Claim pursuant to section 510(c) of the Code. *See id.*

The Foreign Representative, on behalf of the Chapter 15 Debtors, engaged in negotiations with the Trustee during 2010 and 2011 to resolve the Adversary Proceeding. *See* Krys Decl., ¶ 6. In May 2011, the Foreign Representative and the Trustee reached a global settlement (the "Settlement"). *See id.* at ¶ 7; Settlement Motion, ¶ 19. Subsequently, the Court entered an order approving this Settlement on June 10, 2011, followed by the BVI Court that approved the same on June 24, 2011. *See* Krys Decl., ¶ 7. Pursuant to its terms, Sentry is entitled to an allowed SIPA Claim in the BLMIS Proceedings in the amount of $230 million, subject to the Foreign Representative's payment of $70 million of Sentry's cash to the Trustee. *See* Settlement Motion, ¶ 22. Prior to November 2012, the Foreign Representative had paid $24 million to the Trustee, resulting in an allowed SIPA Claim in the interim amount of $78 million. *See id*; Settlement

---

[9] The Net Equity Decision was affirmed by the Second Circuit Court of Appeals in a direct appeal from this Court, *see In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), and was then denied certiorari by the Supreme Court, *see Sterling Equities Assocs. v. Picard*, 132 S. Ct. 2712 (2012).

5

Motion, Ex. A (Dkt. No. 69, Attachment 3) [hereinafter "Settlement Agreement[10]"], ¶ 2. The remaining $46 million due to the Trustee was paid in full, and the Sentry SIPA Claim is allowed in its full amount of $230 million.

The SIPA Claim is presently one of Sentry's primary assets. Apart from the SIPA Claim, Sentry's liquid, non-contingent assets total approximately $115 million in value, comprised of (i) approximately $71 million in cash in an account at Citco Bank Nederland N.V. Dublin branch, which is currently unavailable to Sentry and subject to an order of attachment from a Netherlands court; (ii) approximately $6.7 million in non-BLIMS investments; and (iii) approximately $36.7 million in other cash. *See* Krys Decl., ¶ 9.

### 3. The SIPA Claim Sale

During the final four months of 2010, the Foreign Representative conducted a competitive auction for the SIPA Claim. *See id.*, ¶ 10. At that time, there were many publicly available facts suggesting that the Trustee could obtain substantial returns for the BLMIS Customer Funds. *See* Declaration of Patrick M. McKee in Support of Farnum Place LLC's Objection to Foreign Representative's Application (Dkt. No. 658), ¶ 17. For example, the Trustee had already brought many adversary proceedings, including the one against the Picower defendants seeking more than $7 billion. *See* Declaration of Scott C. Shelley (Dkt. No. 657) [hereinafter "Shelley Decl."], Ex. 19. On December 7, 2010, the Trustee announced a $550 million settlement with the family of Carl Shapiro. *See id.* On December 2, 2010, the Trustee and his counsel filed a lawsuit against JP Morgan Chase, Madoff's primary banker, and related entities, seeking more than $6.5 billion in fees, profits, avoidable transfers and damages. *See id.*

---

[10] Form of Agreement Between The Trustee And Kenneth Krys And Joanna Lau, Solely In Their Respective Capacities As The Foreign Representatives For And Joint Liquidators of Fairfield Sentry Limited, Fairfield Sigma Limited, And Fairfield Lambda Limited, May 9, 2011.

The Foreign Representative elected to accept Farnum's offer to purchase the SIPA Claim for 32.125% of its ultimate allowed amount. *See* Krys Decl., ¶11. The Foreign Representative indicated that Farnum's bid was "in the best interest of the estate of Sentry." *See* Shelley Decl., Ex. 18 (Forbes Hare Letter to Conyers, Dill & Pearman, dated December 6, 2011, Concerning the BVI Applications).

Accordingly, in early December 2010, the parties negotiated, documented and signed, with representation by U.S. counsel, a trade confirmation (the "Trade Confirmation") setting forth the material terms and conditions of the SIPA Claim Sale for 32.125% of its ultimate allowed amount. *See* Declaration of James F. Mooney in Support of Farnum Place LLC's Objection (Dkt. No. 659), ¶¶ 9–11.

At the heart of the Trade Confirmation was a mutual assumption of risk: Farnum assumed the risks associated with having to collect an uncertain amount of distributions on an unknown timeline through the SIPA Proceeding, while Sentry assumed the risk that the recovery rate on customer claims in the BLMIS Proceeding might rise above 32.125%, which it ultimately did. *See id.*

4. **The SIPA Claim Price Spike**

On December 14, 2010, BLMIS customer claims were trading for approximately 20% to 30% of their face value. *See* Application, ¶ 5. Just three days after the Trade Confirmation was signed, the Trustee announced that he had entered into a settlement agreement with the estate of Jeffrey Picower for the forfeiture and repayment of approximately $7.2 billion (the "Picower Settlement"), of which $5 billion was to be paid to the Trustee. *See id.* This led to a dramatic increase in the prices offered for BLMIS claims. It was noted in early 2011, for example, that prices in the "mid 60s" were regularly offered by investors for SIPA claims. *See* Krys Decl., ¶

7

18. Currently, the Trustee has recovered more than 50% of the estimated customer losses in BLMIS. *See* The Madoff Recovery Initiative, http://www.madofftrustee.com (last visited on January 10, 2013). Therefore, the Foreign Representative alleges that the "floor" for the market value of the SIPA Claim is now over 50%, regardless of whether developments in litigation regarding recoveries by the Trustee lead to fluctuations in the market for SIPA claims. *See* Krys Decl., ¶ 17. Since the announcement of the Picower Settlement, the Foreign Representative has received, on an unsolicited basis, inquiries from a number of institutions expressing an interest in purchasing the SIPA Claim for amounts significantly higher than Farnum's sale price. *See id.*

   **5. The Necessary Approvals of the Trade Confirmation**

Under "Other Terms and Trades" in the Trade Confirmation, the parties themselves agreed that the Transaction shall be subject to, *inter alia*, (i) "[a]pproval by the BVI Court of the terms of this Trade Confirmation," and (ii) "[a]pproval by a Final Order of each of the US Bankruptcy Court and the BVI Court of the assignment of the Claim by Seller [Sentry] to Buyer [Farnum]." *See* Krys Decl., Ex. B, p. 4. Under the terms of the Trade Confirmation, the Foreign Representative was obliged to "endeavor to obtain promptly the approval of the BVI Court of the terms and conditions of this Trade Confirmation." *See id.*, p. 10. However, that obligation was expressly made "[s]ubject to Seller's exercise (in Seller's sole discretion) of its fiduciary duties or obligations as court-appointed liquidator." *See id.* The Trade Confirmation expressly provides that it is governed by New York law. *See id.*, p. 9.

   **6. The BVI Proceedings**

On or about May 31, 2011, the Foreign Representative filed an application in the BVI Court recommending that it disapprove the Trade Confirmation (the "First Sentry BVI Application"). *See* Krys Decl., ¶ 21. At the hearing on this application, held on June 7, 2011,

8

the Foreign Representative withdrew the First Sentry BVI Application to "consider issues raised by the BVI Court with respect to the approval of the Trade Confirmation under BVI law." Application, ¶ 25. Subsequently, on or about June 29, 2011, the Foreign Representative submitted an application to the BVI Court (the "Second Sentry BVI Application"), requesting leave to file an application with this Court to consider the Sale and the Trade Confirmation pursuant to section 363 of the Code, as made applicable to the Sale by section 1520(a)(2) of the Code. *See id.* The BVI Court denied the Second Sentry BVI Application without prejudice on the basis that the Trade Confirmation, as a contractual matter, contemplated the BVI Court's consideration and approval prior to making an application to this Court. *See id.*

On October 27, 2011, given that the Foreign Representative had failed to submit an application to secure the BVI Court's approval of the terms and conditions of the Trade Confirmation, Farnum (through BVI counsel) filed an application in the BVI Court (the "Farnum BVI Application") seeking (i) an order pursuant to section 273 of the Virgin Islands Insolvency Act of 2003 (the "BVI Insolvency Act")[11] directing the Foreign Representative to seek approval from the BVI Court of the terms and conditions of the Trade Confirmation and take necessary steps to satisfy other conditions precedent to the Transaction, and, in the alternative, (ii) an order granting Farnum leave to commence proceedings against Sentry for specific performance of the Trade Confirmation or damages resulting from a purported breach of the covenant of good faith and fair dealing. *See* Krys Decl., ¶ 22.

From March 13 to March 15, 2012, the BVI Court conducted a three-day evidentiary hearing regarding approval of the Sale. During that hearing, the BVI Court heard the testimony of fact witnesses, as well as experts for each side on both New York state law and United States

---

[11] Section 273 of the BVI Insolvency Act provides: "A person aggrieved by an act, omission or decision of an office holder may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the office holder." *Available at* http://www.bvifsc.vg/Portals/2/INSOLVENCY_ACT_NO.5OF2003.pdf .

bankruptcy law.[12] On March 27, 2012, the BVI Court issued a judgment (the "BVI Judgment"), *see* Dkt. No. 591, Ex. G, holding that (i) the Trade Confirmation is valid and subsisting as a matter of New York state contract law, *see* BVI Judgment, ¶ 40; (ii) approval of the Trade Confirmation was warranted as a matter of BVI insolvency law, *see id.*, ¶ 57; (iii) the Foreign Representative did not breach the Trade Confirmation or violate any implied covenant of good faith and fair dealing therein in not pursuing the BVI Court's approval of the Trade Confirmation, *see id.*, ¶¶ 29–31; and (iv) the U.S. bankruptcy law issues are properly determined by this Court, *see id.*, ¶ 48 ("[I]t would be unwise for [the BVI Court] to express views on the issues that will arise for determination by the US"). Accordingly, upon the insistence of the Foreign Representative, the BVI Court permitted the Foreign Representative "to take the necessary steps to bring before the US Bankruptcy Court the question of approval (or non-approval) by that Court of the Trade Confirmation" and held that if this Court "decides, for whatever reason, to withhold approval of the Trade Confirmation, that will bring the Trade Confirmation to an end." *See id.*, ¶ 51.

Consequently, on April 18, 2012, the Foreign Representative filed the Application with this Court. Following an unsuccessful attempt at mediation, a hearing (the "Hearing") was held on January 9, 2013.

## DISCUSSION

The threshold issue in the instant Application is whether the Court should conduct a best interests of the estate review under section 363 of the Code ("Section 363"), as urged by the Foreign Representative, in considering disapproval of the Sale. Based on its analysis of the

---

[12] Such experts and witnesses included the Honorable Joseph Bellacosa, retired Judge of the New York Court of Appeals; the Honorable Melanie Cyganowski, retired Chief Judge of U.S. Bankruptcy Court for the Eastern District of New York; Professor Joseph Perillo of Fordham Law School; and Charles Axelrod, counsel with the firm Fox Rothschild LLP.

papers and the arguments set forth at the Hearing, the Court finds that a Section 363 review is not warranted under section 1520(a)(2) of the Code ("Section 1520(a)(2)"). Such finding is consonant with the origins of Chapter 15 and the notion of comity, a central tenet therein. Accordingly, the Application is DENIED.

## I. SECTION 363 REVIEW OF THE SALE IS NOT WARRANTED UNDER SECTION 1520(a)(2)

In considering whether a Section 363 review must be undertaken by this Court, the parties focus on Section 1520(a)(2), which provides:

> (a) Upon recognition of a foreign proceeding that is a foreign main proceeding . . . (2) sections 363, 549 and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate . . . .

11 U.S.C. § 1520(a)(2). The parties dispute whether the instant Sale involves a "transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States" ("Section 1520(a)(2) Transfer"). *See* 11 U.S.C. § 1520(a)(2) (emphasis added). The Foreign Representative argues that a Section 363 review is necessary because the Sale involves such a transfer "within the territorial jurisdiction of the United States:" the "interest" is the SIPA Claim and the "property" is the Customer Funds, both of which are within the United States. Farnum, on the other hand, maintains that a Section 363 review is not necessary because there is no such transfer in the United States: the "interest" is the ownership interests in the SIPA Claim and the "property" is the SIPA Claim itself, both of which are intangibles located in the BVI.

The Court finds that the Sale does not involve a Section 1520(a)(2) Transfer and, therefore, a Section 363 review of the Sale is not warranted under the present circumstances.

11

**A. THE SALE DOES NOT INVOLVE A SECTION 1520(a)(2) TRANSFER**

The instant Sale does not involve a Section 1520(a)(2) Transfer because the allowed SIPA Claim is not "within the territorial jurisdiction of the United States." Rather, according to applicable non-bankruptcy law, it constitutes an intangible asset located in the BVI.

Section 1502(8) of the Code defines "within the territorial jurisdiction of the United States" as:

> [T]angible property located within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within that territory, including any property subject to attachment or garnishment that may properly be seized or garnished by an action in a Federal or State court in the United States.

11 U.S.C. § 1502(8). Therefore, with respect to intangible property, in order to find that "an interest of the Debtor in property" is "within the territorial jurisdiction of the United States," a court must find that such interest is located within the United States under applicable non-bankruptcy law. *See id.*; *see also Butner v. United States*, 440 U.S. 48, 54 (1979) (finding that in assessing the quality and situs of property interests, bankruptcy courts are to apply non-bankruptcy law); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131 (9th Cir. 2010) ("To determine the location of an intangible right to payment, we must look to [applicable] state law."). Thus, New York law, as set forth in the Trade Confirmation and agreed upon by the parties, determines the appropriate situs.

Here, the property in question is the allowed SIPA Claim and Sentry's ownership rights therein. The SIPA Claim Sale contemplates the transfer of Sentry's ownership interest in its rights against BLMIS. *See* Trade Confirmation, p. 1. Under New York law, Sentry's Claim against BLMIS therefore constitutes a "general intangible." *See, e.g.*, *Communicators PCS L.P. v. Gabriel Capital, L.P.*, 394 B.R. 325, 337 (S.D.N.Y. 2008) (suggesting that contingent rights to

12

payment such as licenses, proceeds of certain collateral, causes of action and capital stock are each "general intangibles"); *see also In re Iroquois Energy Mgmt.*, *LLC*, 284 B.R. 28, 31 (Bankr. W.D.N.Y. 2002) (finding debtor's right to a refund in connection with its overpayment for natural gas was in nature of a "general intangible" under the Uniform Commercial Code).

In determining the location of intangibles under New York law, the flexible test annunciated in *Severnoe Securities Corp. v. London and Lancashire Insurance Co.*, 255 N.Y. 120, 123–24 (1931), which has been adopted by many New York courts and is referred to by both parties, applies here:

> The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them. The locality selected is for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, the place where the debtor can be found. *At the root of the selection is generally a common sense appraisal of the requirements of justice and convenience in particular conditions.*

*Id.* (emphasis added) (internal citations omitted). Indeed, "determination of situs for one purpose has no necessary bearing on its determination for another purpose" and the corresponding analysis is highly contextual. *Bankers Trust Co. v. Equitable Life Assur. Soc. of U.S.*, 19 N.Y.2d 552, 556–57 (1967) ("Stated another way, [determining the situs of intangibles] is fundamentally a question of ease of administration and of equity."); *see Yayasan Sabah Dua Shipping SDN BHD v. Scandinavian Liquid Carriers Ltd.*, 335 F. Supp. 2d 441, 448 (S.D.N.Y. 2004) ("[P]inpointing the location of intangible assets . . . is a dilemma that calls for a practical judgment"); *In re Iroquois Energy Mgmt., LLC*, 284 B.R. 28, 31 (Bankr. W.D.N.Y. 2002) (emphasizing that "the concerns for justice and the convenience of all parties who may have an interest in that asset" must be adequately apprised in ascertaining the location of that intangible asset).

In applying the *Severnoe* test, the *Iroquois* court shed light on the relevant considerations regarding the situs of an intangible in the context of a right to a payment from a third party. There, the court found that right constituted an intangible property interest. *In re Iroquois*, 284 B.R. at 32. In determining the situs of such interest, the court then found that it was located at the domicile of the debtor, not with the third-party obligor. *Id*. The court reasoned that the relevant interest "arises not from contacts in the jurisdiction of any [third-party] obligor of the [debtor], but principally from contacts with the debtor's domicile or principal business location" because: (i) "[t]o its own secured creditors, the owner of an intangible asset provides the one certain link between the secured claim and the payment of cash. From a transaction secured by intangibles, the source of cash is a step removed," (ii) the underlying dispute involved only the debtor and the creditor, and (iii) the dispute arose "principally from contacts with the debtor's domicile or principal business location." *Id.*[13]

As in *Iroquois*, justice, convenience and common sense dictate that this Court find that the SIPA Claim is located with the debtor in the BVI, and not the third-party obligor. Indeed, the Sale involves the transfer of the SIPA Claim by a BVI incorporated entity, being administered by the BVI Court. The Liquidator was appointed by, and must answer to, the BVI Court. This Court has recognized that the Liquidator is deemed to "have custody and control of all the assets" of Sentry under the BVI Insolvency Order, *In re Fairfield Sentry Ltd.*, 452 B.R. 52, 56 (Bankr. S.D.N.Y. 2011), and that the Liquidator conducts the business of administering Sentry's

---

[13] The Foreign Representative wrongly asserts that *Iroquois* is not pertinent because it applied a choice of law analysis. *See* Reply in Further Support of Foreign Representative's Application (Dkt. No. 676) [hereinafter the "Reply"], p. 26 n.25. This assertion overlooks that the primary basis for the court's conclusion that New York law applied was its finding that the situs of the intangible property interest in question was in New York. *See In re Iroquois*, 284 B.R. at 31–32 (framing the choice of law analysis with the assertion, "[i]n defining rights to intangible property, New York looks to the law of the situs of those assets," and concluding, "[w]hile the refunded cash may at one time have been situated in Canada, the situs of [the debtor's] interest in that refund is New York . . . . Accordingly, New York's substantive law must govern the effectiveness of [the creditor's] security interest.").

assets in the BVI, *see In re Fairfield Sentry*, 440 B.R. at 64–65.  The Liquidator himself, in arguing that this Chapter 15 Court was not the proper forum to examine the Settlement, emphasized: "The BVI court oversees the [Chapter 15 Debtors'] activities and administers [their] estates . . . .  That is the proper venue for dealing with the reasonableness of this settlement under applicable law in connection with the fiduciary duties of the Fairfield liquidators."  *See* Transcript Regarding Hearing Held on June 7, 2011, *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-1239 (Dkt. No. 93) at 14:4–11.  In addition, at this time, the Foreign Representative seeks relief against *his claim* to BLMIS Customer Funds; he is not seeking relief against those funds themselves.  *See* Trade Confirmation, p. 1 (providing for the sale of the "Claim," which is defined as "[a]ll Seller's rights, title and interest in and to Seller's claims against BLMIS in the Proceedings").  Finally, any proceeds of the SIPA Claim Sale will be administered in the BVI pursuant to BVI insolvency law to primarily foreign creditors.

In sum, in undertaking a common sense appraisal of the requirements of justice and convenience in the instant circumstances, this Court finds that the SIPA Claim is not within the territorial jurisdiction of the United States and, therefore, the Sale does not involve a Section 1520(a)(2) Transfer.[14]

---

[14] Belatedly, the Foreign Representative in his reply, for the first time, seeks to establish claim situs in the United States under section 1502(8) of the Code by asserting that the SIPA Claim is subject to attachment in New York. *See* Reply, pp. 26–27.  The Foreign Representative mistakenly relies on *ABKCO Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) for the proposition that the situs of an intangible property interest for purposes of attachment is the location of the obligor.  *ABKCO* holds, however, that the situs of "intangible personal property in an *ordinary contract*" for attachment purposes is the location of the obligor.  *Id.* at 675 (emphasis added).  Thus, because, *inter alia*, a SIPA claim to a pool of slowly accumulating assets is not akin to an ordinary contract, and the Court has not otherwise been persuaded for attachment purposes that the situs of the SIPA Claim is in the United States, this argument fails.  Furthermore, even if the SIPA Claim were located in the United States for attachment purposes, it cannot be "properly seized or garnished," *see* 11 U.S.C. § 1502(8), because it is stayed by the BVI Court in accordance with BVI law, as well as by this Court by operation of law under section 1520(a)(1) of the Code.  *See* BVI Insolvency Law § 175; Verified Petition of Foreign Representatives Kenneth Krys And Christopher Stride In Support of Application of Fairfield Sentry Limited For Recognition of Foreign Main Proceeding (Dkt. No. 2), Ex. A; *In re Fairfield Sentry*, 440 B.R. 60.

**II. COMITY**

Such finding is consistent with Chapter 15's origins and its governing concept of comity. The origins of Chapter 15 rest in section 304 of the Code ("Section 304) and the Model Law on Cross–Border Insolvency ("the Model Law"), each of which were specifically designed to formalize cross-border coordination and cooperation, as well as delineate the role of an ancillary court as an aid to the foreign main court in international insolvency proceedings. *See, e.g.*, H. Rep. No. 95-595, 95th Cong. 1st Sess., 324-325 (a977); S. Rep. 95-989, 95th Cong., 2d Sess. 35 (1978) (indicating Section 304 "governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings"). Integral to these objectives is the governing concept of comity, which is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

Both parties cite to the Fifth Circuit's recent decision in *In re Vitro S.A.B. de CV,* No. 12-10542, 2012 WL 5935630 (5th Cir. Nov. 28, 2012) and the Delaware Bankruptcy Court's decision in *In re Elpida Memory, Inc.*, No. 12-10947, 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012), recent cases that are at odds with each other regarding the role of comity in Chapter 15. While the *Vitro* court elevated comity to a "principal objective," *see* 2012 WL 5935630, at **7, 26 (finding comity to be "the rule . . . not the exception"), the *Elpida* court found that comity is "not the end all be all of the statute," 2012 WL 6090194, at *8. For the reasons stated below, this Court disagrees with the *Elpida* court's downplay of the role of comity in Chapter 15.[15]

---

[15] Although the *Elpida* court correctly focuses on the location of domestic assets in considering the application of Section 1520(a)(2), it also focuses extensively on the application of comity. Interestingly, the *Elpida* court found

16

The doctrine of comity predates the United States Bankruptcy Code, *see Hilton*, 159 U.S. at 164, and was placed as one of six factors to be considered in granting relief under former Section 304.  *See* REORGANIZING FAILING BUSINESSES: A COMPREHENSIVE REVIEW AND ANALYSIS OF FINANCIAL RESTRUCTURING AND BUSINESS REORGANIZATION, VOL. II, American Bar Association, Business Law Section, 13-12 (2006) [hereinafter "Reorganizing Failing Businesses"].  It has become the primary consideration in the grant of relief analysis as observed by the United States Court of Appeals for the Second Circuit in *Bank of New York v. Treco (In re Treco)*:

> [C]omity is the ultimate consideration in determining whether to provide relief under § 304. The purpose of the section is to provide a statutory mechanism through which United States courts may defer to and facilitate foreign insolvency proceedings.

240 F.3d 148, 156 (2d Cir. 2001); *see also* Reorganizing Failing Businesses, p. 13-12.

The importance of comity has been codified in Chapter 15 to emphasize its primacy by inserting it in the preamble of section 1507(b) of the Code, rather than listing it as one of the source factors of displaced section 304(c) of the Code.  *See Vitro*, 2012 WL 5935630, at *26. The analog to section 1507 is article 7 of the Model Law ("Article 7").  The United States delegation to UNCITRAL (Working Group V), of which the undersigned was, and is, a member, was instrumental in inserting language of comity status elevation to Article 7 (section 1507(b) of the Code): "Therefore, in section 1507(b), comity is raised to the introductory language to make clear that it is the central concept to be addressed."  *See* Burton R. Lifland, *Chapter 15 of the*

---

support in its evaluation of the importance of comity by counting the number of times it appears in Chapter 15 (two). The relevance of that exercise is questionable in view of the substantial jurisprudence otherwise extant.  The comity analysis notwithstanding, *Elpida* is on entirely different footing from the instant case in light of the existence of a Chapter 15 controlling order as part of the recognition order in that case.  Specifically, due to concerns raised by U.S. creditors, the *Elpida* court modified the recognition order and explicitly prohibited the foreign representative from selling "Elpida's U.S. assets or interests without first . . . obtaining approval of [the U.S. Bankruptcy] court." *See In re Elpida Memory, Inc.*, Interim Order Modifying Order Recognizing Foreign Representatives and Foreign Main Proceeding, Case No. 12-10947 (Dkt. No. 138).  Here, on the other hand, there was no such court order from either this Court or the BVI Court requiring this Court's approval of the sale of assets—all that exists, at most, is a similar but *gratuitous* approval requirement present in the Trade Confirmation.

*United States Bankruptcy Code: An Annotated Section-By-Section Analysis*, CROSS-BORDER INSOLVENCY AND CONFLICT OF JURISDICTIONS (Bruylant, 2007); *see also Suggested Modification to Ancillary Proceeding Statutes*, 4 AM. BANKR. INST. L. REV. 530 (1996) (same author).

Indeed, Chapter 15 emanates from and was designed around this central concept of comity, as evidenced by its primary purpose and deferential framework for international judicial cooperation. *See, e.g.*, 11 U.S.C. § 1501(a) (specifying Chapter 15's "most basic objective is to foster the orderly administration of cross-border restructurings"); 11 U.S.C. § 1504 (indicating that "any case commenced under Chapter 15 is 'ancillary' to a foreign proceeding pending elsewhere"); 11 U.S.C. § 1525 ("[T]he [ancillary] court shall cooperate to the *maximum extent possible* with a foreign court") (emphasis added); 11 U.S.C. § 1527 (stating cooperation "may be implemented *by any appropriate means*") (emphasis added); *see also In re JSC BTA Bank*, 434 B.R. 334, 342 (Bankr. S.D.N.Y. 2010) (emphasizing that ancillary cases are "meant to support, not supplant, a main proceeding in a foreign jurisdiction"). All in all, "Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity." *Vitro*, 2012 WL 5935630, at *16. In fashioning such relief, courts must "take into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *Id.* (internal quotations omitted).

Considering the facts before the Court, as established above, it is clear not only that the SIPA Claim is located in the BVI, but also that the BVI Court has the paramount interest in the sale of the SIPA Claim. Moreover, this Court lacks a meaningful interest in the disposition of the SIPA Claim. Once this Court approved the Settlement between the Trustee and Fairfield Sentry and the claims allowance procedure order in the SIPA Liquidation, it relinquished its

18

stake in the adjudication of the Sale of the SIPA Claim, parking it squarely in the BVI Court. Even if requested to do so, this Court is not empowered to enjoin the BVI Liquidator from entering into a voluntary claim assignment or sale of the SIPA Claim in the BVI. In addition, there are no interests, such as liens or intellectual property, unique to any of the United States parties at issue, and United States creditors have limited interest in the SIPA Claim Sale. *See In re Fairfield Sentry*, 440 B.R. at 62 (indicating the Debtors "were established as vehicles for mainly non-U.S. persons and tax-exempt United States entities to invest with BLMIS"). Put another way, the transaction at issue is BVI-centric for purposes of this Court's review. Under such circumstances, comity dictates that this Court defer to the BVI Judgment.

Failing to grant such comity to the BVI Judgment under these circumstances "necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial 'second bite at the apple.'" *See SNP Boat Serv. Sa v. Hotel Le St. James*, No. 11-CIV-62671, 2012 WL 1355550, at *9 (S.D. Fla. Aug. 27, 2012) (reversing bankruptcy court decision permitting discovery for the purpose of determining whether a judgment creditor's interests were sufficiently protected in a foreign proceeding). This Court, supervising an ancillary proceeding, declines to offend principles of international comity by second guessing the BVI Court's approval of the Sale when the United States' interests are so minimal. Chapter 15 was not designed to permit parties to mix and match multiple countries' laws, which would lead to "haphazard, erratic, or piecemeal" adjudication of the distribution of assets, *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009), as the administration and disbursement of *the same* assets would be handled by "different tribunals in different countries according to different laws," see Daniel M. Glosband, *et al.*, THE AMERICAN BANKRUPTCY INSTITUTE GUIDE TO CROSS

19

BORDER INSOLVENCY 6 (2008). As the drafters of the Model Law emphasized, "inharmonious legal approaches"—such as ones in which parties can obtain duplicative, cross-border review on the basis of a contrived relationship to an ancillary court—"hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets." UNCITRAL, LEGISLATIVE GUIDE ON INSOLVENCY LAW, ANNEX III, 310, ¶ 13 (2005). Furthermore, an absence of "predictability in the handling of cross-border insolvency cases impedes capital flow and is a disincentive to cross border investment," *id.*, which is exactly the outcome Chapter 15 was designed to prevent, *see Fogerty v. Petroquest (In re Condor Ins. Ltd.)*, 601 F.3d 319, 322 (5th Cir. 2010).

\* \* \*

For the reasons set forth above, this Court declines to conduct a plenary Section 363 review.[16]

## CONCLUSION

To the extent that this Court has been requested to express its view of the Trade Confirmation, this Court finds no basis for disapproval thereof. Accordingly, the Application is DENIED.

**IT IS SO ORDERED.**

Dated: New York, New York           /s/ Burton R. Lifland
       January 10, 2013             United States Bankruptcy Judge

---

[16] Attempting to cover all bases, the Foreign Representative also seeks a Section 363 review pursuant to sections 1521(a), 1507(a) and 105(a) of the Code. However, such a review is not warranted under section 1521(a) of the Code's "appropriate relief" because it contravenes Section 1520(a)(2)'s express territorial limitation. *See JSC BTA Bank*, 434 B.R. at 342. Nor is such a review warranted under section 1507(a) of the Code's "additional assistance" because, as explained above, it violates principles of comity. Finally, such a review is not warranted under section 105(a) of the Code because such section, on its own, cannot form a basis for such a review. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("The short answer to these arguments is that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").